## Case No. 12,354.

### The SARAH STARR.

[1 Spr. 453.] [1]

District Court, D. Massachusetts. Feb., 1859.

MARITIME LIENS—HOME PORT—CREDIT OF OWNER —COSTS.

1. A vessel was built in Connecticut, and sold to a merchant in New York, the purchase-money to be paid by instalments, and the builders to hold the title until full payment. She went into the possession and control of the purchaser, was documented in the name of the builders, and the port painted on her stern was in Connecticut, and a ship chandler in the city of New York furnished necessaries for her in that port, not knowing of any interest, or possession of the purchaser: *Held*, that he might have a lien as on a foreign vessel.

[Cited in Harney v. The Sydney L. Wright, Case No. 6082a; The Jennie B. Gilkey, 19 Fed. 129; Blowers v. One Wire Rope Cable, Id. 448.]

2. By the case of Pratt v. Reed, 19 How. [60 U. S.] 359, a purchaser of supplies necessary to a foreign vessel can assert no lien therefor, unless he prove that they could not have been obtained, without such lien, upon the personal credit of the owner.

[Cited in The A. R. Dunlap, Case No. 513; The Lulu, 10 Wall. (77 U. S.) 201.]

3. In obedience to this authority, the libel was dismissed; but as the law had previously been otherwise understood and administered here, costs were refused.

H. W. Paine, for libellant, cited The Fortitude [Case No. 4,953]; Thomas v. Osborn, 19 How. [60 U. S.] 22; The Chusan [Case No. 2,717]; The Nestor [Id. 10,126]; Tree v. The Indiana [Id. 14,165]; Hill v. The Golden Gate [Id. 6,492]; St. Jago De Cuba, 9 Wheat. [22 U. S.] 409.

R. H. Dana, Jr., for claimant, cited Pratt v. Reed, 19 How. [60 U. S.] 359; Thomas v. Osborn, Id. 22; The Coernine [Case No. 2,944]; St. Jago De Cuba, 9 Wheat. [22 U. S.] 409; The Golden Gate [supra], and cases there referred to; Abb. Shipp. 40, notes, and cases cited; Webb v. Peirce [Case No. 17,320]; 9 Stat. 635, § 5; Abb. Shipp. 57, notes; The Fortitude [supra]; Jac. Sea Laws, 359; The Alexander, 1 Dods. 279; Ross v. The Active [Case No. 12,071]; The Aurora, 1 Wheat. [14 U. S.] 106.

SPRAGUE, District Judge. This is a libel by Van Winkle and others, ship chandlers of New York, to enforce a lien for cordage furnished to the bark Sarah Starr, in that port.

There is no doubt that the cordage was necessary to enable this vessel to enter upon a

¹ [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

contemplated voyage, upon which she soon after sailed; and the articles were furnished upon the credit of the vessel. It is insisted in the defence, that no lien was created under the maritime law, for two reasons: first, that the Sarah Starr was not a foreign vessel, and second, that there is no evidence that the cordage could not have been obtained upon the personal credit of the owners, and without security upon the vessel. As to the first objection, the facts are that this vessel was built by Messrs. Sheffields of Stonington, Connecticut, who made a contract with one Morgan, to sell her to him, upon an agreement that he should pay a small part of the purchase-money in cash, and the residue by numerous instalments; and that upon the payment of the whole, he should have a bill of sale. The title was to remain in the Sheffields, until full payment of all the instalments, but Morgan was to have the possession and control of the vessel, until he made default of some payment. Under this agreement, possession was delivered to Morgan, who continued to run her nearly three years, without having paid the whole purchase-money, although all the instalments had become due. Previously to April, 1858, Morgan had let the vessel on shares to Bunnell, the master, who obtained the supplies sued for by the libellants. Morgan resided in New Jersey, but had a place of business in the city of New York. The vessel was enrolled and licensed at the custom house in Stonington, as owned by the Sheffields, and she hailed from that place. The libellants had no knowledge of Morgan, or that he had any connection with the vessel, nor did they know that the master had taken her upon shares. They trusted the bark as a foreign vessel, upon the request of the master, acting, so far as they knew, only in that capacity; and I am satisfied that they had a right to consider her as belonging to the state of Connecticut, and therefore foreign, while in the port of New York. The legal title was in the Sheffields. All the custom house documents declared her to belong to Stonington, and such also was the representation by the vessel herself, by the home-port painted upon her stern. The first objection cannot prevail.

The second objection is that there is no evidence that these supplies could not have been obtained upon the personal credit of the owner. It is not contended that there was no necessity for obtaining these supplies upon credit, for there is no pretence that the master had funds, or means, wherewith to pay for them; but the precise objection is, that although it was necessary that they should be obtained on credit, yet there is no evidence that they could not have been obtained upon the personal responsibility of the owners, without security on the vessel. The case of Pratt v. Reed, 19 How. [60 U. S.] 359, has been cited in support of this objection. Before that case, the law, as understood and administered here, was as follows: That the

master of a vessel was not authorized, as between himself and the owner, to purchase supplies, unless they were necessary; and if necessary for the vessel, still he was not authorized to obtain them on the credit either of the owner or vessel, if he had funds at his command wherewith to pay for them. To justify the master, therefore, in obtaining supplies for his vessel upon credit, there must have been a twofold necessity. The supplies must have been necessary, and the credit must have been necessary. But where such twofold necessity existed, and the master might rightfully obtain the supplies on credit, he could do so upon the credit of the vessel, as well as of the owners. Thus far as to the authority of the master.

As to the rights of material men; in order to authorize them to trust to the vessel, and create a lien upon her, it was requisite, first, that the vessel should need the supplies, or that after reasonable inquiry she should appear to need them; and secondly, that in giving credit to the vessel and owners, the material man should act in good faith, and he would not be deemed to act in good faith, if he knew that the master had funds wherewith to pay for the supplies, or, if facts were known to him, which should create suspicion, and put him upon inquiry, when such inquiry would have led to the knowledge that the master had funds, and had no right, therefore, to obtain supplies on credit. That is, if the material man had knowledge that the master was acting in bad faith toward his employers, or knew of circumstances which ought to admonish him to make inquiry that would have led to such knowledge, then he would be affected with bad faith, as colluding with the master, and aiding him in violating his duty to his owner. But if the material man had no reason to suppose that the master was violating his duty in obtaining a credit, he might, upon request of the master, trust to the vessel and owners, and a lien would thereby be created. The further inquiry, whether, if credit were necessary, it would not be practicable to obtain the supplies upon the mere personal responsibility of the owner, was never required or even suggested. The right to trust to a vessel, where credit was properly given, was a matter of course. This was for the benefit of the owners; for the greater the security where credit is given, the better the terms, and to a foreign owner this would rarely be unimportant, however good his personal credit might be, for some apprehensions as to the continued solvency of persons engaged in commerce, are never absent from the prudent seller.

But the case of Pratt v. Reed [supra], fully sustains the second objection made by the respondent's counsel. It is directly in point. It is useless to inquire whether, from the facts of that case, the court might have arrived at the same result upon other grounds, because they expressly place their decision upon the want of evidence that the supplies could not have been obtained, without security upon the vessel. Assuming that the coal furnished was necessary for the steamer, and that the master had no means wherewith to pay for it, that is, that a credit was necessary, still the court held, that in the absence of all evidence as to the personal credit of the owner, no lien could be created. The decision did not turn upon the question, whether credit was in fact given to the vessel, but solely upon the question, whether the seller had a right to give credit to the vessel, and obtain a lien, without proving that the owner had no personal credit, upon which the supplies might have been obtained. By that decision all subordinate tribunals are bound, and in submission thereto, my decree in the present case must be against the libellant.

But to enable me to perform my duty in awarding or refusing costs, I have thought proper to look at the grounds of the decision of Pratt v. Reed. Two authorities are cited. The first is the case of The Alexander, 1 W. Rob. Adm. 336, but found on pages 288 and 346. There must be some mistake in the citation. I have read that case more than once, and cannot find one word in it that gives countenance to the opinion, in support of which it is invoked. Its whole aspect is adverse. That case was twice before the court. First, on a question of jurisdiction, and subsequently on its merits. The claim was the price of a cable and anchor furnished to a Norwegian vessel by a ship chandler in the port of London. Two grounds of defence were relied upon. First, the cable and anchor were not furnished for the use of the ship, but sold to the master, as his own adventure, and upon his credit. The second, that the articles were not necessary. The case was vigorously contested, fully argued, and an elaborate judgment was pronounced by the court. The whole proceeded upon the assumption, that there was a lien to be enforced by the court, unless the defence was sustained. No proof was adduced that the articles could not have been obtained upon the personal credit of the owner; and it was not suggested, either in the pleadings, arguments, or judgment, that such proof was necessary. And yet, if the action could not have been sustained, without such proof, a long and laborious examination of the evidence, both by counsel and by the court, might have been wholly dispensed with. Not only was there no evidence that the supplies could not have been obtained upon the sole responsibility of the owner, but the presumption is violent that personal credit was alone relied upon. The purchase was made in 1835. At that time no tribunal in England could enforce any lien for a material man. Such liens, therefore, had practically no efficacy, and could hardly have been relied upon as security. It was not until four or five years afterwards, by act of 3 & 4 Vict., that the court of admiralty was

authorized to take jurisdiction of claims for necessaries furnished to foreign vessels. That act did not create a lien, it is true, but it brought into activity maritime liens, which for a long time had been in a state of suspended animation, under the pressure of prohibitions from the common law courts. The act merely restored an ancient jurisdiction of the admiralty. 1 W. Rob. Adm. 293, 360. In the case of The Alexander, the libel did not allege that the supplies could not have been obtained upon the personal credit of the owner. And if that fact was necessary, in order to sustain the action, the want of such an allegation was fatal. Yet upon such a libel the court takes jurisdiction, to enforce the asserted lien, and requires the claimant to put in his defence. In the course of his opinion, Dr. Lushington says, "In the present case . . . by the general maritime law of Europe, the ship would be liable for the necessaries supplied." Yet the case then before the court was only that made by the libel, no answer or proof having been put in. Page 295. And it is upon this statement of facts, containing no assertion, or intimation that the supplies could not have been obtained upon personal credit, that Dr. Lushington asserts that a lien would arise by the general maritime law. The same doctrine is stated, as if unquestionable, in The Virgin, 8 Pet. [33 U. S.] 550; and by Judge Story, in The Fortitude [Case No. 4,953]; and by Judge Ware, in The Phebe [Case No. 11,064].

Indeed, it is laid down in [The Virgin] 8 Pet. [33 U. S.] 550, that even in case of bottomry bond, the burden is not upon the lender, to prove that the money could not have been obtained upon the personal credit of the owner. The court says, "The necessity of the supplies and advances being once made out, it is incumbent upon the owners, who assert that they could have been obtained upon their personal credit, to establish that fact by competent proofs."

The only other authority referred to by the court, in Pratt v. Reed, is their own decision in Thomas v. Osborn, at the same term, reported in 19 How. [60 U. S.] 22. It is not cited as a decision in point, but only as having laid down a principle, embracing a question then before the court. In that case there was a difference of opinion among the judges, as to the effect of the evidence, but a majority of the court came to the conclusion that the master had deserted his duty, by leaving the personal command of the vessel, and employing her in conveying his own property between Rio Janeiro and San Francisco, and by misappropriating earnings of the vessel to a large amount, all of which was well known to the lender, or furnisher, in that case, who had, indeed, actively aided the master in all these transactions. The principle, therefore, involved in the decision was merely that of good faith. What was intended to be referred to, I presume, must have been the following remarks in the opin-

ion of the court, in Thomas v. Osborn, on page 30 of 19 How. [60 U. S.] viz: "But the limitation of the authority of the master to cases of necessity, not only of repairs and supplies, but of credit to obtain them, and the requirement that the lender, or furnisher, should see to it that apparently such a case of necessity exists, are as ancient and well established as the authority itself."

Upon this quotation it may be observed, that the rule therein laid down is merely that there must be a necessity for the credit. It does not touch the question whether, if the master be without funds, and if he must purchase on credit, a lien may be created on the vessel. No doubt, in that respect, is even suggested. Taking those remarks, therefore, in their fullest extent, and without qualification, they by no means reach or affect the question decided in Pratt v. Reed. But those remarks ought not to be taken alone, and without explanation. What is said about the duty of the lender, or furnisher, must mean that he must not know that credit was unnecessary, and that when admonished by circumstances, he must make inquiry; that is, he must act in good faith. If the remarks are not to be so understood, but are to be understood as asserting that the lender, or furnisher, is bound to show that he has made inquiry, although he had no reason to suspect that the master had funds, or was violating his duty, it would be supported by no authority. Yet the assertion is rested wholly upon authority; indeed it is laid down as being ancient and well established, and numerous citations to prove this immediately follow. These citations, and the observations of the court thereon, go no further than to show that the lender, or furnisher, is bound to diligence as to the necessities of the vessel, and good faith as to the necessity for the credit. See pages 30 and 31. As the result of the authorities, the law is laid down on page 31, in the following words: "To constitute a case of apparent necessity, not only must the repairs and supplies be needful, but it must be apparently necessary for the master to have a credit, to procure them. If the master has funds of his own, which he ought to apply to purchase the supplies which he is bound, by the contract of hiring; to furnish himself, and if he has funds of the owners, which he ought to apply to pay for the repairs, then no case of actual necessity to have a credit exists. And if the lender knows these facts, or has the means, by the use of due diligence, to ascertain them, then no case of apparent necessity exists to have a credit; and the act of the master, in procuring a credit, does not bind the interest of the general owners in the vessel." Here is not even a suggestion, that if there be a necessity for credit, the vessel may not be bound as much as the owner. It goes only to this.—that if the master has funds, he has no right to obtain credit; but if he has not, he may obtain it

on the liability of the vessel, as well as of the owner. So much for the two authorities.

The court, in Pratt v. Reed, do not go into any argument, or discussion of principle, in support or elucidation of their decree. It is, indeed, said, toward the close of the opinion, that these liens should be strictly limited to the necessities of commerce which created them, and that any relaxation of the law in this respect, will tend to perplex and embarrass business. But this does not aid us, and could not have been intended to aid us, in determining what are the necessities which create liens, or what would be a relaxation of the law. I believe it may be safely said, that those who have been practically engaged in commerce and navigation, and those who have been most frequently called upon to administer the commercial law, have always thought that the power of a master to give a lien upon his vessel, when a necessity for supplies, and of credit, existed, in a foreign port, as heretofore understood, was highly beneficial. They have never experienced, nor heard of, embarrassments therefrom, and they would feel a change of the law as more than a misfortune. The law protects the rights of bona fide purchasers, by requiring that, as against them, these liens should be enforced with reasonable diligence. Intelligent owners are well aware that the mere personal responsibility of men engaged in trade, in a distant place, is not trusted with the same readiness as if accompanied by security upon property; and that whatever risk the lender, or furnisher, thinks he takes, must be paid for in the enhanced price of the articles. And to this it may be added, that if the furnisher is hereafter to be held to prove, in all cases, that the master could not have obtained supplies upon the personal responsibility of his owners, he must also be indemnified, in some way, for taking this hazard, which will not be inconsiderable; for it is the hazard of what may be the after-thoughts of competitors in business, and what they may swear, at a future day, with regard to their willingness to have trusted. And it may be asked, what degree of credit will be required? Must it be the highest or the lowest, or what intermediate grade? Will a lien be excluded, if the supplies can be otherwise obtained upon any terms, or will it be allowed, if the discount be ten, twenty, or what other per cent.?

There is another feature of the case now before me, which I am compelled to notice. There is not, either in the libel or answer, any allegation as to the personal credit of the owners, or as to the ability of the master to obtain the supplies on such credit merely. Such allegations, indeed, would be new in this court, and I am not aware of any precedent for them elsewhere. Now the inquiry presents itself,—how can I decide against the libellant, merely because there is no evidence that the owner had not sufficient personal

credit, when that fact was not in issue; when the pleadings nowhere either assert or deny it? How can I hold the libellant to prove what is not alleged by either party? To this I can only reply, what indeed is entirely sufficient, that here again the case of Pratt v. Reed is directly in point. In that case there was no allegation, and no issue, as to the personal credit of the owner; and the court decided against the libellant, because he had introduced no evidence to show that security upon the vessel was necessary, and that the supplies could not have been had upon the mere personal responsibility of the owner.

The difficulty arising from the pleadings, which seemed to have been in the common form, is not noticed by the court; but I cannot assume that it was overlooked. In the case now before me, the answer alleges that credit was not, in fact, given to the vessel; and in Pratt v. Reed, there was the same allegation. But no notice was taken of that issue, it being superseded by the point upon which the cause was decided. The court held, that in the absence of evidence as to the personal credit of the owner, the furnisher had no right to trust to the vessel; and this, of course, rendered it wholly immaterial whether he did so or not.

Being instructed and governed by the case of Pratt v. Reed, I must decide that the libellant never had any lien upon this vessel, and the libel must be dismissed. But I think it must be without costs, they being within the discretion of the court. And it has been with reference to the exercise of this discretion, that I have been obliged to consider how the law was understood prior to that case, and whether the libellant had good grounds to expect to prevail, before it was known to him. I think he had, and that he ought not, therefore, to be subjected to the payment of costs.

Libel dismissed without costs.

NOTE. Mr. Justice Story, who was declared by Lord Campbell (2 Story's Life of Story, 429) to be the first jurist of the age, and whose exhaustive research and thoroughness of learning, especially in admiralty law, have scarcely been equalled, seems never to have heard of the doctrine promulgated in Pratt v. Reed. In his elaborate judgment in the case of The Fortitude [supra], he laid down the law as to tacit hypothecations, in the same manner as did Dr. Lushington, as above quoted. In the same opinion, Judge Story declares that there must be a different necessity, in order to uphold a bottomry bond; that if the money can be obtained upon the credit of the owner, he is not at liberty to subject the ship to the expensive and disadvantageous lien of an hypothecatory instrument. That most learned and accomplished admiralty lawyer, Judge Ware, in The Phebe [supra], says: "All the contracts of the master, with the mariners for their wages, with material men for repairs and supplies of rigging, or for provisions, or other necessaries for the vessel, involved a tacit hypothecation of the ship and freight." In what Judges Story, Lushington and Ware have said of resulting liens, they have but followed the common language of the books.

SARAH STARR, The. See Cases Nos. 105 and 106.