## Case No. 9,360.

### The MAY QUEEN.

[1 Spr. 588; [1] 23 Law Rep. 658; 44 Hunt. Mer. Mag. 626.]

District Court, D. Massachusetts. Feb., 1861.

SEAMEN—WAGES—EMPLOYED IN TOWING—LIEN—TO WHAT IT EXTENDS.

1. The mate and engineer of an enrolled steamer, employed in towing vessels in and about the harbor of Boston, have a maritime lien upon the steamer for their wages.

[Cited in Raft of Cypress Logs, Case No. 11,-527; The Sarah Jane, Id. 12,349; The Atlantic, 53 Fed. 608.]

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

2. Such lien extends to the boiler, notwithstanding the claim of the makers, who put it into the steamer, under an agreement that it should continue their property, until paid for, with a right to remove it, should any instalment be overdue; and instalments are unpaid and overdue.

[Cited in The John Farron, Case No. 7,341; The Charlotte Vanderbilt, 19 Fed. 220; Blowers v. One Wire Rope Cable, Id. 448; The James H. Prentice, 36 Fed. 781.]

3. The lien of the seamen is not impaired by knowledge of such agreement.

The libellants, the engineer and mate of a tow-boat, sue for wages, and several parties come in as claimants for certain portions of the steamer, and for the proceeds, as mortgagees. Benjamin F. Rogers comes in, by petition, claiming to hold a mortgage, and to be paid the same out of the proceeds. M'Kay and Alders also come in, alleging that they put a boiler into the steamer, which they still own, by virtue of an agreement in writing, of the tenor and effect stated in the opinion of the court, on record at the custom-house, where the steamer is enrolled; that this agreement was made with Walter F. Dodge, the master and owner, and was known to the libellants; that the boiler is still their property, and not liable to process.

R. D. Smith, for libellants.

C. T. Russell & Chas. Houghton, for M'Kay, cited the following authorities: 1st. As to the service being maritime: Curt. Merch. Seam. 5, 353; 1 Pars. Mar. Law, 477, 489, 490; 2 Pars. Mar. Law, 583–585; Packard v. The Louisa [Case No. 10,652]; The Phoebus, 11 Pet. [36 U. S.] 183; Phillips v. The Thos. Scattergood [Case No. 11,106]; Thackarey v. The Farmer of Salem [Id. 13,852]; Smith v. The Pekin [Id. 13,090]; Gurney v. Crockett [Id. 5,874]; The Amstel [Id. 339]; 1 Stat. 132; Act July 20, 1790, § 6; The Canton [Case No. 2,388]; 1 Kent, Comm. 379, note 2d. As to the ownership of the boiler: Coggill v. Hartford & N. H. R. Co., 3 Gray, 545; Sargent v. Metcalf, 5 Gray, 306; Blanchard v. Child, 7 Gray, 155; Burbank v. Crooker, Id. 158.

SPRAGUE, District Judge. Two questions have been raised. 1st. Whether this service was in its character maritime; and 2d. Whether, if the libellants have a lien upon the vessel, it attaches also to the boiler, notwithstanding the claim of M'Kay and Alders.

As to the first, this steamer is about eighty tons burden, and duly enrolled as an American vessel, was built at Philadelphia, was subsequently found at Bucksport, Maine, and afterwards in Boston. Her employment, during the time which the libellants were on board, was that of a steam tug, towing vessels in and near the harbor of Boston; generally within, but sometimes going beyond, the light, upon the high seas. The whole employment was upon tide-waters. No part, not even loading or unloading of a cargo, was upon land. It certainly is not necessary that the service should have been upon the high seas, in order to be maritime. That idea is, indeed, thrown out in Thackarey v. The Farmer of Salem [Case No. 13,852], but the same judge decided in Smith v. The Pekin [Id. 13,090] that a voyage between two ports in the Delaware river was maritime; and there are several similar decisions. It is urged that the libellants lived on shore, but prior to the 18th of October, Taylor, the mate, lived wholly on board of the vessel, and Douglas, the engineer, took his meals on board, but slept on shore, except when his services were required at night, which was not often. After the 18th of October, both lived on shore, except dining on board. If it were doubtful, from the other evidence, whether the employment of the libellants was on land, or on the sea, the circumstance of their living on shore might be material; but the other evidence is not equivocal, and the living on shore is by no means a decisive criterion. Pilotage, for example, is a maritime service, and yet the pilot not unfrequently lives on shore. He may pilot vessels only outward bound, going on board and returning the same day, eating and sleeping in his own house, and follow this employment from day to day, or only occasionally, and yet each act of pilotage would be a maritime service. Hobart v. Drogan, 10 Pet. [35 U. S.] 120.

Indeed, such is the rapidity with which passages are now made, that a steamer may run by daylight, on the high seas, from state to state, and yet the officers may sleep and take their meals on shore.

In Gurney v. Crockett [Case No. 5,874], Betts, J., decided that merely moving a vessel from one anchorage to another, in the harbor of New York, was a maritime service. The present case comes within the principles laid down in The Canton [Id. 2,388].

One of the libellants was the mate, and the other the engineer, of this steamer. Some question has been made, as to the latter's having the lien of a seaman. But engineers are as essential to the navigation of a steamer, as mariners who manage the sails are to the navigation of a sailing vessel; both control the motive power, and are equally entitled to the rights of a seaman.

I am of opinion, that both the libellants have a lien upon this vessel, for the amount of their wages.

Does this lien attach to the boiler, notwithstanding the claim of M'Kay and Alders? They were the makers of the boiler, and put it into this steamer, under an agreement with Dodge, her owner, that it should remain their property, until fully paid for, and that, if any instalment of the purchase-money should be overdue, they should have a right to remove it. It has not been paid for, and the instalments are overdue, and they now claim to remove it. As between them and Dodge, they have a right to do so; and it is contended that they have the same right against

the libellants, at least, as to that part of their wages which were earned after they had knowledge of the claim of M'Kay and Alders.

This boiler was in the steamer, fastened in the usual manner, to her timbers, and united with her machinery, and constituted the sole motive power, at the time these libellants entered upon their service. There is no color for saying, that they had any knowledge of the claim of M'Kay and Alders, prior to the 11th of November; and, even then, there was no notice by M'Kay and Alders, that they should hold the boiler, as against the seamen; nor is there any evidence of an agreement, either express or implied, by the libellants to waive their lien, or relieve the boiler therefrom; the most that can be said is, that they had information, which might put them upon inquiry, as to the agreement under which the boiler was put into the boat, by its makers. But, if they had made such inquiry, and had obtained actual knowledge of the agreement between M'Kay and Alders on the one part, and Dodge on the other, it would not have impaired their security. When the makers of the boiler put it into, and made it a part of, this steamer, essential to her navigation, and left her under the exclusive control of her owner, they subjected that part of the steamer, in common with all other parts, to the lien of all seamen whom the owner might employ, in her navigation. If M'Kay and Alders had owned the whole vessel, and had made precisely the same agreement in regard to her, and let her go into the possession and control of Dodge, there is no doubt that seamen employed by him would have security upon the vessel. So, if they had owned an undivided portion. And it can make no difference, that the part of the vessel which they owned was physically separable; otherwise, the sails of a vessel might be withdrawn from a seaman's lien, by the sailmaker who furnished them; the rigging by the rigger; spars by the sparmaker; the rudder by the carpenter; and so of every separable portion, until nothing might be left for the security of the mariners but a condemned and worthless hulk; and, with equal reason, that also might be withdrawn by any person who had furnished it, upon condition of retaining the ownership, until paid for. Seamen are not bound to inquire into the ownership of a vessel, on board of which they serve; and if they know the general owners. in whole or in part. and know also, that those with whom they contract have only a special ownership and control for the time being. it does not impair their lien upon the whole vessel.

The mortgagees do not interpose any claim, as against these libellants. Decree for wages and costs.