HYNDMAN (ROOTS v.). See Case No. 12,-040.

HYNES (PATTON v.). See Case No. 10,-835.

## Case No. 6,987.

### The HYPERION'S CARGO.

[2 Lowell, 93; [1] 7 Am. Law Rev. 457.]
District Court, D. Massachusetts. Dec., 1871.[2]

MASTER'S LIEN FOR DEMURRAGE—ADMIRALTY—BILL OF LADING.

1. By the maritime law a master has a lien upon the cargo for demurrage, and such a lien may be enforced in the admiralty. This, although demurrage was not expressly stipulated for in the bill of lading.

[Cited in 275 Tons Mineral Phosphates, 9 Fed. 211; The Ferreri, Id. 471; The L. B. Snow, 15 Fed. 284; Houge v. Woodruff, 19 Fed. 137; Blowers v. One Wire Rope Cable, Id. 449. Quoted in Hawgood, v. 1310 Tons of Coal, 21 Fed. 684. Cited in The William Marshal, 29 Fed. 329; Bellatty v. Curtis, 41 Fed. 480.]

2. An ordinary bill of lading implies an agreement that the goods shall be received within a reasonable time after the arrival of the vessel at her port of destination.

[This was a libel in admiralty by James E. McDowell and others against Walter Donaldson and others for freight and demurrage.]

S. Wells, for libellants.
J. Nickerson, for claimants.

LOWELL, District Judge. The libellants' right to freight is not contested; but it is said that there can be no recovery for demurrage, because no express contract was made concerning it, and the law will not imply one against a consignee. Gage v. Morse, 12 Allen, 410, is cited as conclusive on this point. That case decided that a consignee, merely as such, does not, by accepting the goods, make an engagement with the master that he will receive them at any particular time, unless there is something on the face of the bill of lading fixing the time. Judge Betts came to the opposite conclusion in a case in which the consignee was the owner of the cargo. Sprague v. West [Case No. 13,255]. The case at bar resembles in its circumstances that before the court in New York; for I understand the title to this coal to have been in the claimants from the time it was loaded on board the Hyperion, if not

before. But I am not concerned here with the question whether the claimants are personally responsible for demurrage, but with the liability of the cargo to such a demand. There is no doubt that the shipper of goods by an ordinary bill of lading impliedly agrees that they shall be received at the port of destination within a reasonable time after the arrival of the vessel, according to the usual course of the trade. By the common law the master has no lien upon the goods, as security for this obligation. In my opinion he has such a lien, or, more strictly speaking, such a privilege, by the maritime law, and that it may be enforced in the admiralty. It is a maxim of the general law-merchant that the ship is bound to the merchandise, and the merchandise to the ship. Pard. Droit Com. arts. 709, 961; Valin, Comm. bk. 3, tit. 1, arts. 11, 24; Bouch. Ins. Droit Mar. §§ 926–934. This reciprocal privilege appears to extend to all claims which may arise on the one side or the other out of the contract of affreightment. Thus article 308 of the French Code de Commerce declares that the captain is privileged before all creditors for the payment of his freight and the averages (avaries) that are due him. The word "avaries" I understand to include all damages which the master may lawfully demand in the premises. Indeed, the distinction between liquidated and unliquidated damages is unimportant in those jurisdictions in which the master's lien is a privilege to be enforced by the courts, and not a mere right of retainer; for the courts can deal as readily with the one kind of damages as with the other. I have found no exception of any class of charges or damages; and though the term "avaries" is the most common, yet "debts" and "expenses" and some other expressions are used, showing that "averages" has no technical signification. See Pardessus, note 6 to article 24 of the Laws of Oleron, 3 Pard. Collect. 345; Id. Code of Car. XI. of Sweden, 3 Pard. Collect. 158. Indeed, the learned author whom I have so often cited says that the master contracts rather with the merchandise than with the shipper; and he has his privilege for the freight even against the true owner of the goods, though they had been stolen (Pard. Droit Com. art. 961); and Valin says, that the contrary opinion is absurd (Valin, ubi supra). I quote this example to show that the privilege does not depend on any doctrine of agency, as well as to fortify my opinion that the merchandise is liable for whatever the shipper is liable for.

When the common law of England was modified by the introduction of many rules from the law-merchant, the former law had no process for enforcing this reciprocal privilege of the ship and the goods, and had succeeded in repressing the only court that had the requisite modes of action; and was, therefore, obliged to say that it could not recognize the maxim, even when embodied

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed in Case No. 3,985.]

in express contract, as it usually is in English charter-parties. Birley v. Gladstone, 3 Maule & S. 205; Gladstone v. Birley, 2 Mer. 401. From the time of those decisions to that of Gray v. Carr, L. R. 6 Q. B. 522, the history of this question in the courts of common law in England has been that of a struggle between ship-owners to create liens by stipulation, especially liens for demurrage, and of the courts to narrow the stipulations by construction. See Phillips v. Rodie, 15 East, 547; Faith v. East India Co., 4 Barn. & Ald. 630; How v. Kirchner, 11 Moore, P. C. 21; Tindall v. Taylor, 4 El. & Bl. 219; Bishop v. Ware, 3 Camp. 360. In nearly all those cases the obvious intent of the parties has been disregarded, and a remedy refused for a violated right. In this country the courts of admiralty have retained their proper jurisdiction, and can enforce the privilege, by whichever party this action may be invoked. Dupont de Nemours v. Vance, 19 How. [60 U. S.] 162; The Belfast, 7 Wall. [74 U. S.] 624; The Maggie Hammond, 9 Wall. [76 U. S.] 450. Cases in which the cargo has been libelled for freight are numerous. The Volunteer [Case No. 16,991]; Certain Logs of Mahogany [Id. 2,559]; Poland v. The Spartan [Id. 11,246]; The Salem's Cargo [Id. 12,248]; The Eliza [Id. 4,347]. And so of a contribution for general average and other demands. Mutual Safety Ins. Co. v. Cargo of the George [Id. 9,981]; Bags of Linseed, 1 Black [66 U. S.] 108; The Convoy's Wheat, 3 Wall. [70 U. S.] 225. The only question of any difficulty is, whether the privilege extends to demurrage not expressly stipulated for in the bill of lading. Upon this point the cases at common law do not afford much aid; because they recognize no general responsibility of the goods to the ship, but only a right of retainer, which, they say, cannot be conveniently exercised in support of a demand for unliquidated damages,—a point of no consequence in the admiralty. Sprague v. West [supra]. Nearly all salvage claims against cargo are unliquidated. We uphold libels against the ship every day in behalf of the merchant for unliquidated damages to his goods; and there is no reason for not doing so, on the other side, for damages in not receiving the goods in due season. My own conviction is that the privilege of the ship-owner in the admiralty is not limited by the master's lien at common law, but depends on the law-merchant, and that by the law-merchant the privilege extends to all charges, damages, and expenses arising out of the affreightment. [The privilege, indeed, is lost by an unconditional delivery of the cargo, and in this respect it resembles a lien at common law. This is a rule of convenience, designed for the protection of dealers, and in aid of the freedom of commerce.] [3]

The evidence in this case is plenary, that

[3] [From 7 Am. Law Rev. 457.]

the cause of the delay at the wharf was the lack of cars to take away the coal; that it might easily have been taken out and received at the rate of one hundred tons a day, which is the rate usually agreed on in the trade, but that the consignees wished to receive it in the cars. They refused to receive it in any other way, and said they would pay the freight when it should all be out, but no demurrage. The master was justly angry at this language, and brought his libel. I am much inclined to think his action for the freight was premature; though not for demurrage, which accrues from day to day; but as the claimants admit a liability for the freight, and the libellants admit that part of the demurrage they now ask for was not due when the libel was filed, it seems to me just to give to the libellants their whole damages, but without costs. A libel will not be dismissed merely because it was brought too soon, if substantial justice can be done, and ought to be done, under it. The Salem's Cargo [supra]; The Isaac Newton [Case No. 7,089]; Furniss v. The Magoun [Id. 5,163]. Here, as in the case before Judge Sprague, the cargo is now beyond the reach of process, and therefore the libel ought to be retained.

A specification of the libellants' damages, which was used at the trial, shows that they ask for twelve days' demurrage. Upon the evidence, it seems to me that the vessel was delayed at least that length of time by the want of cars, and I shall give damages at thirty dollars a day for the twelve days. Decree for libellants.

| | |
|---|---|
| For freight...................... | $ 756 98 |
| Demurrage .................... | 360 00 |
| | $1,116 98 |
| With interest from August 16, 1870, but without costs,—17 months and 1 day............. | 95 14 |
| | $1,212 12] [4] |

[From this decree, the claimants appealed to the circuit court, where the decree of the district court was affirmed, with costs. Case No. 3,985.]