### HOUGE *v.* WOODRUFF and others.

*(District Court, S. D. New York.   January 8, 1884.)*

1. SHIPPING—DEMURRAGE—REASONABLE TIME—CARGO OF SALT.

   A merchant who buys cargo on board ship after her arrival, taking no transfer of the bill of lading or charter-party, and having no knowledge of either, is bound only to the use of reasonable diligence in discharging in conformity with the custom of the port.

2. SAME—CHANGE OF BERTH.

   Where a vessel has obtained a berth at the place assigned by the merchant, and is ready to discharge, and she proceeds at his request to another berth, where a further delay arises, the vessel is entitled to be paid for the expense and delay caused by such removal, in the absence of any special usage of the port or trade authorizing such a change at the vessel's expense.

3. SAME—CUSTOM.

   By usage in the salt trade, rainy weather is deducted, salt not being removable without damage during such weather.

The bark Elliseff, of which the libelant was master, brought in ballast about 257 tons of salt from Lisbon to New York, where she arrived on the twenty-sixth of December, 1880.  The salt came under a charter-party and bill of lading consigned to Hagemeyer &

Brun, who entered it in the custom-house and sold it on board to the respondents. The latter had no knowledge of the charter-party or the bill of lading, and took no transfer of either. The vessel went to Merchants' stores on the twenty-seventh of December, obtained a berth on the 28th, and gave respondents notice that the ship would be ready to deliver on the 29th. On the afternoon of the 28th the respondents, by letter, requested the captain to go to Wallabout to discharge. The captain at once called on the respondents, and, as he testified, refused to go unless the respondents would guaranty that there was sufficient water, which he said the respondents did guaranty. Mr. Woodruff, with whom this interview was held, denied this statement, and testified that he stated only that larger vessels than this had discharged at the Wallabout; that he did not think there would be any difficulty about it, and that the captain must examine and satisfy himself; that the captain went out and afterwards came back and said he would go, whereupon the vessel was taken, on the 29th, to the Wallabout by a tug hired by respondents for that purpose. On arrival there, the harbor-master stated that no berth could be had until the 31st, owing to the presence of other vessels. On the 31st a berth was in readiness, but in the mean time, owing to extreme and unusual cold, the vessel got frozen in, so that she was unable to reach her berth until the fourth of January. The discharge was commenced on that day and finished on the 12th. One thousand bushels per day, equaling 33 tons, was proved to be a reasonable and customary rate of receiving and discharging a cargo of salt, and that rainy days were not counted in the salt trade, as that article cannot be discharged in bad weather with safety. The charter-party provided for a discharge at the rate of 50 tons per day; the bill of lading contained no provision on the subject.

*Butler, Stillman & Hubbard,* for libelant.

*Beebe, Wilcox & Hobbs,* for respondents.

BROWN, J. As the respondents bought this salt from the consignee, who had entered it as his own, and took no transfer of the charter-party or bill of lading, and had no knowledge of either, they are not responsible upon any of the provisions of those instruments. 1 Maude & P. Merc. Shipp. 393. The whole evidence, however, makes it clear that upon the purchase of the salt, which was by verbal contract only, they were to receive it from the ship. Their obligations with respect to the discharge are, therefore, only to use reasonable diligence, in conformity with the customs of the port, as in cases of the absence of any bill of lading, or of any stipulation in the bill of lading on the subject of discharge. *Coombs* v. *Nolan,* 7 Ben. 301; *The Hyperion's Cargo,* 2 Low. 93; *Cross* v. *Beard,* 26 N. Y. 85; *Henley* v. *Brooklyn Ice Co.* 14 Blatchf. 522; *Kane* v. *Penney,* 5 FED. REP. 830.

Considering the sworn testimony of the captain shortly after the transaction, and the contents of his letter of the 28th, I cannot doubt

that the vessel went to Merchants' stores by direction of the respondents. On the 27th she obtained a berth and was ready to discharge there on the 29th, after a delay of two days. She then went to the Wallabout, at the request of the respondents, where there was a further unavoidable delay of two days; but after those two days she could have obtained a berth had the ice not further delayed her. It cannot be assumed, in the absence of positive proof to the contrary, that the directions of the harbor-master were improper, or that there was any other vacant berth which she could have procured earlier. Where a vessel has once obtained a berth at a dock, directed by the merchant, and is in readiness to discharge there, the merchant certainly has no right, in the absence of a particular usage, or of some stipulation authorizing it, to send the vessel to another berth, except at his own expense for the removal, and for any delay which properly arises from it. Where an established usage has been proved giving the merchant a right to, at least, one change of berth in the discharge of the cargo, he is not liable for the delay caused by the removal, because that is a part of the vessel's obligation. *Smith* v. *60,000 Feet of Yellow Pine Lumber*, 2 FED. REP. 396, 400; *Moody* v. *500,000 Laths*, Id. 607. No such usage was proved in this case; nor, in fact, was any part of the cargo discharged at Merchants' stores.

The Wallabout basin was a proper and customary place for the discharge of salt. The respondents might properly have directed the vessel there in the first instance, but as the vessel had already lost two days' time in obtaining a berth at Merchants' stores under the respondents' direction, and the same time would have been necessarily lost at the Wallabout in obtaining a berth by the 31st, the respondents must be charged with the two days' double delay caused through their own change of direction. The master, it is true, seems to have acquiesced in this removal, because the charter-party required him to make one removal in delivery, if desired; and he does not appear to have understood that the respondents were not bound by the terms of the charter-party. The respondents cannot claim the benefit of this provision, unless they are willing to be bound to discharge at the rate of 50 tons per day, which they do not accept. The charter-party must therefore be wholly disregarded. As the first of January was a holiday, and the 2d was Sunday, there was but one additional day's lost time, namely, the 3d, before the vessel had got along-side her berth and commenced her discharge. This delay was caused by the ice, and not by the fact that the vessel grounded in the mud at low water. The ice arose from extreme and unusual cold,—a fortuitous accident of the elements, for which the owner of the cargo is not responsible, in the absence of specific lay days, and when liable only under the obligation to use reasonable diligence in receiving cargo. *Cross* v. *Beard*, 26 N. Y. 85; *Coombs* v. *Nolan, supra; The Mary E. Taber*, 1 Ben. 105; *The Glover*, 1 Brown, Adm. 166; *Fulton* v. *Blake*, 5 Biss. 371; *Kane* v. *Penney, supra*. After the 4th, one day, the

9th, being Sunday, there was no delay in discharging beyond the customary rate, which would allow eight working days.

Decree for the libelants for two days' demurrage, at the customary rate of 10 cents per ton per day, amounting to $84.

------

### THE ALPS.

*(District Court, S. D. New York.* December 28, 1883.)

1. SEAMEN'S WAGES—FINES—DISCIPLINE.
   In modern maritime law fines upon seamen being a forfeiture of wages, *pro tanto,* cannot be imposed by the master by way of discipline and punishment for minor offenses, except as regulated and provided by statute.

2. SAME—MERCHANTS' SHIPPING ACT OF GREAT BRITAIN.
   The merchants' shipping act of Great Britain provides that the shipping articles may contain such stipulations for fines as may be approved by the board of trade. When such approved stipulations are a part of the shipping articles signed by the seamen, fines may be imposed accordingly by the master.

3. SAME—SHIPPING ARTICLES.
   Such fines, however, cannot be allowed in diminution of a seaman's wages except upon proof by the shipping articles that such stipulations were agreed upon.

4. SAME—SUMMARY PROCEEDINGS.
   In summary actions for seamen's wages, the authority of the statute is sufficiently pleaded by a general reference to the law of Great Britain. The court is authorized by section 4597 of the Revised Statutes to inflict partial forfeiture of wages for disobedience of lawful commands.

5. SAME—CASE STATED.
   Where a British seaman on a British vessel was fined by the master two dollars for foul language and quarrelsome conduct, and afterwards, on being required to listen to the reading of the entry on the log, imposing the fine, he refused to attend or listen, and was fined two dollars, being two days' pay for the last offense, *held* that, in the absence of proof of the shipping articles, the first fine could not be allowed or deducted from his wages, but that the last fine should be allowed by the court for the seaman's disobedience of a lawful command, under section 4597 of the Revised Statutes, as well as section 243 of the merchants' shipping act.

In Admiralty.

*Hyland & Zabriskie,* for libelant.

*McDaniel & Souther,* for claimants.