### BLOWERS v. ONE WIRE ROPE CABLE.

*(District Court, S. D. New York. January 18, 1884.)*

1. SHIPPING—FREIGHT, LIEN FOR.
   A barge has presumptively a lien for her freight upon the goods laden on board, which is not waived by any provisions of the contract of hire not absolutely incompatible with the enforcement of the lien at the time of delivery.

2. SAME—CONTRACT TO TAKE ON BOARD WIRE CABLE.
   A contract to take on board wire cable in New York to be laid in the Erie canal, freight, the hire of the barge, at a *per diem* rate, to be paid as soon as the cable is laid, is not incompatible with such a lien, and with proceedings to enforce it at once in default of payment as agreed.

3. SAME—PRIVATE ARRANGEMENT BETWEEN MANUFACTURER AND OWNER.
   Where wire cable was laden on board a barge by the manufacturer, pursuant to an agreement between the shipper and the owner of the barge, of which the manufacturer was chargeable with knowledge, *held*, that the barge had a lien upon the cable for her freight pursuant to the contract, and that such lien was not affected by the private arrangement between the manufacturer and shipper, not known to the libelant, that the cable should be paid for on delivery, nor by the fact that the manufacturers, upon completing the lading of the cable, kept the shore end fast upon their premises, so as not to permit the departure of the barge with the cable abroad. *Held, also,* that the cable, as between the manufacturers and the libelant, must be regarded as laden on account of the libelant's contract, and as the goods of the shipper, and that the manufacturers were estopped from denying this, as respects the libelant, although, as between the manufacturers and the shipper, the title may not have passed.

4. SAME—LIEN ARISES, WHEN.
   A maritime lien for freight arises from the time the goods are laden on board.

5. SAME—LIEN AS AGAINST MANUFACTURER.
   As the barge under her contract with the shipper would, as against him, be entitled to a lien on the goods during the time the vessel was detained by reason of his not fulfilling his contract with the libelant, *held*, that the lien existed to the same extent as against the manufacturers, who, for their own benefit, had held the vessel fast by the shore end of of the cable until they removed the cable under the stipulation given in this suit.

The libel in this case was filed by the owner of the barge E. M. Greenman, to recover freight under an agreement for the transportation of some 15 miles of wire rope cable from the city of New York, to be laid in the Erie canal. The charter was executed on September 10, 1880, between the New York Steam Cable Company and the libelant, whereby the latter agreed "to furnish the canal-boat E. M. Greenman, of Buffalo, for the purpose of taking on board and laying in the Erie canal a quantity of cable of the parties of the second part, the boat to be maintained in good condition and sufficiently manned, at $5 per day from the time of commencing to load until reaching the Erie canal at West Troy, after which $6.50 per day, until fully unloaded;" and the cable company thereby agreed "to pay the sum above mentioned upon performance of the agreement." At the time the charter was signed the cable company had agreed with the Wire Rope Manufacturing Company, by verbal contract, for the manufacture at its factory, near the wharf at One Hundred and Fiftieth street, Harlem, of the cable in question, to be delivered along-side the wharf, on board of a boat to be sent by the cable company, as the cable was manufactured; and upon delivery to be paid for by the cable company, one-half in cash and the other half in stock of that company. The manufacturing company also agreed, as part of the contract, to pay to the cable company one-half of the expense of the boat during the time it lay at the wharf taking the cable aboard.

The president of the cable company, after this agreement, procured the libelant's boat to be sent to the wharf under the above charter, where it arrived on the thirteenth of September, 1880. The cable was manufactured and put on board by the manufacturing company, at the rate of about a mile a day, and the lading completed on the third of October, 1880. The cable lay in a single coil extending the whole length of the barge, fore and aft, but running ashore into the manufacturing company's factory and there connected with the machinery, but was not cut off or let loose so that the barge could depart. The manufacturers thereupon demanded pay for the cable according to the terms of the contract with the cable company, but not obtaining the cash payment agreed on, continued to hold the shore end of the cable fastened to their premises. Numerous interviews took place between the agents of the two companies and the libelant, having reference to the payment of their respective demands. The cable company, during the three or four months following, paid the libelant, as his boat lay at the wharf, some 10 payments, amounting altogether to not quite $200, and the agent of the manufacturing company, at the request of the president of the cable company, paid the libelant the sum of $52.50, on account of its one-half part of the expenses of the boat while lying at the wharf and receiving the cable on board, pursuant to the agreement between the two companies. The cable company became insolvent, and went into the hands of a receiver, who declined to interfere in the matter.

In the spring and summer of 1881, the barge remaining all the time at the wharf, and the shore end of the cable still fastened in the manufactory, the libelant or his attorney, in several interviews and letters, required payment of the amount due the boat under the agreement, and that she be released by the removal of the cable, and threatened to remove it himself if this was not done. The vice president and superintendent of the manufacturing company always objected to this, and throughout this long period encouraged the libelant in the expectation that all difficulties would be settled through the action of the cable company or its president, Mr. Foote, and frequently forbade removal of the wire from the barge. On the nineteenth of July, 1881, the present libel was filed against the cable for the libelant's claim. The manufacturing company appeared as claimants, and thereupon removed it from the barge, and, in their defense to the action, claimed that under the charter no lien attached; and, *second*, that there was no such delivery of the cable on board as subjected it to any claim of the libelant.

*J. A. Hyland*, for libelant.

*Scudder & Carter* and *Geo. A. Black*, for respondents.

BROWN, J. It is claimed that no lien could attach under the charter in this case, because the provision that the freight was not to be due until the vessel had performed her contract, that is, until the cable had been laid in the Erie canal, shows that no lien on the cable was contemplated, and that none could have been enforced by action if the freight or hire of the barge had not been paid according to contract as soon as the cable had been laid. It is undoubtedly true that where the express stipulations as to payment of freight are incompatible with a claim upon the cargo, the lien will be deemed waived. *Ruggles v. Bucknor*, 1 Paine, 363; *Raymond v. Tyson*, 17 How. 53, 61. But in this case payment was due upon performance as in the ordinary cases of the transportation of goods on freight; nor do I perceive anything in the fact that the cable was laid in the canal incompatible with the right of the libelant immediately to proceed to libel the cable, as it lay, by a suit *in rem*, and to attach and seize it through the marshal, as in other cases, if the charterer had failed to pay the contract price upon the delivery being complete. I understand, the law, as generally administered, to be that the lien of the vessel upon the goods, and of the goods upon the vessel, attaches from the moment the goods are laden on board, and not from the time only when the ship breaks ground. *The Bird of Paradise*, 5 Wall. 545, 562, 563; *Bulkley v. Naumkeag, etc., Co.* 24 How. 386, 393; *The Yankee Blade*, 19 How. 82; 1 Pars. Shipp. & Adm. 174, and notes; *The Hermitage*, 4 Blatchf. 474; *The Eddy*, 5 Wall. 481, 494. This objection, therefore, cannot be sustained.

The situation of the barge, with 15 miles of cable on board, but made fast at the shore end upon the manufacturer's premises, is doubtless a peculiar one. The manufacturing company did not in-

tend to make a complete delivery in favor of the cable company, except on receipt of the cash payment agreed on, and it is claimed that they were, therefore, in possession of the cable while it was on the barge through the control they exercised over it by holding fast to the shore end. The manufacturers, however, are clearly chargeable with notice of the relations of the libelant to the cable company. In loading the cable on board they could not have supposed that the barge belonged to the cable company. They knew that it came under some contract with the libelant, by which he was to have pay for the use of it, for they agreed to pay one-half of the expenses of the vessel while she was receiving the wire, and they subsequently made a payment on this account. So far as the libelant was concerned, therefore, they must be held to be chargeable with knowledge of the contract between him and the cable company, and that in the ordinary course of business the libelant would have a lien for the hire of the boat upon all cable put aboard. They must be held, therefore, to have laden the cable on board the libelant's boat pursuant to his contract with the cable company. The libelant, in receiving it on board, received it in execution of his contract with the cable company, and the manufacturers in putting it aboard did so on account of the cable company, at least so far as respects the libelant's rights. The libelant had no knowledge of the terms of the contract between the two companies, and there were no circumstances putting him upon inquiry. He had no right to refuse to receive the wire on board when tendered by the manufacturers; on the contrary, he was bound to receive the cable on board, precisely as he did accept it; and in thus accepting it and permitting it to be laden on board, he received it evidently under, and in part execution of, the contract of affreightment; and the manufacturers are clearly chargeable with notice of these facts. It is clear, therefore, as it seems to me, that the libelant could not be bound to receive the wire on board under his contract without at the same time acquiring that lien on the cable which by the maritime law attaches to goods from the moment they are laden on board. Had the manufacturers desired to put the cable on board under such qualifications and restrictions as would prevent the ordinary lien of the vessel from attaching, they were bound to give the libelant express notice of this intention and condition on loading; and the libelant might in that case have lawfully refused to receive the cable on board under such qualifications. As the manufacturers did not do this they must be held, as respects the libelant, to be estopped from denying that they loaded the goods on board the barge as the goods of the cable company, and to have voluntarily subjected the cable to the lien of the vessel thereon, without regard to their own private relations to the cable company as respects their right to payment on delivery. *Faith* v. *East Ind. Co.* 4 Barn. & Ald. 630. The same principle of estoppel as regards the lien of material-men upon vessels or their equipment, without regard to the actual title, has been applied in the

case of *The May Queen*, 1 Spr. 588; *The St. Jago de Cuba*, 9 Wheat. 409, 418; and *The Sarah Starr*, 1 Spr. 453.

As respects the cable company, it is manifest that the delivery of tne cable was not complete, and was not intended by the manufacturers to be complete, until they should obtain the cash payment agreed upon; but this, so far as the libelant was concerned, was a secret arrangement between the two companies, of which the libelant had no knowledge; and the intention of the manufacturers to hold on to the shore end of the cable, instead of cutting it loose, when the whole amount was put on board, was in no way communicated to the libelant until the cable had all been loaded. The manufacturers being then unable to obtain their pay, refused to cut the shore end of the cable so as to allow the vessel to depart and perform her contract, and in their endeavor by subsequent negotiations with the cable company and the receiver to procure their pay, they kept the vessel in that condition, and would neither remove the cable nor suffer it to depart.

The manufacturers, it is true, were not, as respects the cable company, bound to deliver the cable or suffer the vessel to depart without being paid according to their contract. The cable company in omitting to pay for the cable as their contract provided, so as to permit the departure of the vessel, in effect obstructed and prevented the further performance by the vessel of her contract after the cable had been taken aboard, though the vessel was ready to proceed and complete her contract. The vessel is entitled, therefore, to compensation according to the contract price prior to reaching West Troy. The manufacturers have no equity to contest this, for the reason that, having put the wire on board with substantial knowledge or notice of the libelant's rights, they could not afterwards, upon failure to get their pay as expected, rightfully keep the vessel tied to the wharf for their own benefit, in the hope of speedy payment for the cable put on board.

By the charter the libelant was to have five dollars a day for the vessel until she arrived at Troy. She has been prevented from the full performance of her contract, after having taken the cable aboard, through the default of the charterer; and, by this default, with the concurrent acts of the claimants, the vessel was detained until the cable was removed from on board, under the bond given by the claimants on August 23, 1881, after this libel was filed, in all 343 days, making $1,715. The increased price of the barge after reaching the Erie canal is presumably on account of the increased expense subsequently attaching. The time during which she was detained at the wharf was far more than sufficient for the laying of the cable, so that full compensation for her contract will be given by an allowance of the stipulated price of five dollars per day for the time during which she had the cable on board, amounting to $1,715, from which, deducting $240.50 already paid, a balance remains due of $1,474.50. Where a lien on the cargo for freight exists, it extends also as against the

freighter, by the maritime law, though otherwise at common law, to demurrage and damages for the unreasonable detention of the vessel, though not expressly agreed upon. *The Hermitage,* 4 Blatchf. 474; *The Hyperion's Cargo,* 2 Low. 93; *Sprague* v. *West,* Abb. Adm. 548. But in the present case, compensation for the vessel, while lying at the wharf with the cable on board, is not in the nature of damage for detention, but is a part of the express contract of the charter to pay for the vessel at the rate of five dollars per day until arrival at Troy.

The libelant is therefore entitled to a decree for $1,474.50, with interest from August 23, 1881, with costs.