GLOUCESTER MANUF'G CO. (SICKLES v.). See Case No. 12,841.

GLOUCESTER MARINE INS. CO. (YOUNGER v.). See Case No. 18,183.

---

## Case No. 5,488.

### The GLOVER.

[Brown, Adm. 166.] [1]

District Court, N. D. Ohio. Oct., 1872.

DEMURRAGE—CONSIGNEE—CUSTOM.

1. Where no "lay days" are provided in the charter party or bill of lading, and there is no express stipulation as to the time of unloading, the consignee is not liable for delays occurring without his fault.

[Cited in Bowen v. Decker, 18 Fed. 752; Houge v. Woodruff. 19 Fed. 138; The J. E. Owen, 54 Fed. 187.]

2. If it is a custom at the port of delivery for vessels to be unloaded through an elevator, each vessel waiting its turn, such custom becomes part of the contract, and the master takes upon himself the risks and delays incident to such a method of unloading.

[Cited in Finney v. Grand Trunk Ry. Co., 14 Fed. 172; Barrett v. Oregon R. & Nav. Co., 22 Fed. 452; The Mary Riley v. Three Thousand Railroad Ties, 38 Fed. 255.]

The libel in this case was filed in personam to compel the payment of demurrage by the

1 [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

consignee Thomas Walton, for seven days' detention of the schooner Glover, in unloading a cargo of barley in the port of Cleveland. The bill of lading was in the usual form, but did not provide for "lay" days, nor for compensation for detention. It was general in its form, such as is customary on the lakes. From the proof it appeared that the vessel arrived at 10 o'clock a. m., on Wednesday, October 4th, and was forthwith reported to Thomas Walton, the consignee. That upon inquiry, both by Walton and the captain, no elevator could be found in the port that would agree to unload her before the next Friday. That on Friday, the 6th, the vessel was at the Erie Elevator and commenced unloading, but the cargo of barley was found to be wet, caused by leaking through the hatches, and they therefore ceased unloading; that by the next Tuesday the barley, by throwing open the hatches and by other means, became dry enough to commence unloading; that about one-half was unloaded, when some of the machinery of the elevator broke, and the barley was not entirely unloaded until Thursday. It was also established by the proof that it was a general and uniform custom along the lakes, including this port, that the consignee should have twenty-four hours, after the arrival of a vessel at the docks, to provide a place and prepare for its unloading; that all grain should be unloaded by means of an elevator, and that, in unloading at an elevator, every vessel should take its turn in the order of its arrival. Under this state of facts the libellants, on the one hand, claimed to recover damages for the detention of the vessel, at the rate of $75 per day, the agreed value, and, on the other hand, the respondent and consignee claimed that he was not liable for such detention, as it was not caused by his fault or neglect.

Willey, Cary & Terrell, for libellant.
Prentiss & Vorce, for respondent.

SHERMAN, District Judge. The liability of the consignee in this action turns upon the question whether the law imposes upon him the payment of damage when the detention was not caused by his actual fault or neglect. Originally it was held that damage could only be recovered when it was expressly stipulated for in the contract of affreightment or bill of lading; but of late years it is established that it may also be recovered when there is a breach of an implied covenant or duty on the part of the consignee. In former times, all charter parties and bills of lading, stipulated on behalf of the freightors or consignees, that a certain number of days should be allowed for unloading, and that, after their expiration, an agreed price per day should be paid for demurrage. The courts before whom such contracts came, uniformly held that the consignee was liable for such demurrage, no matter for what reason or whose fault caused the detention. They so held, because it was the contract of the parties, but chiefly because it was a contract mutually entered into, and

the consignee could have provided for a large number of days, or could have stipulated against a liability for delay caused by means and occurrences over which he had no control. Randall v. Lynch, 2 Camp. 352, 12 East, 179; 1 Par. Shipp. 314. In other cases, where, according to modern usage, there is no stipulation for "lay days" or demurrage in the charter party or bill of lading, the courts uniformly, both in England and America, hold that where there is no express stipulation as to the time of unloading, a consignee is not liable for delays occurring without his fault, or a failure on his part to comply with some of the obligations imposed on him by law or a custom of the port as to unloading. 2 Camp. 483; Burmester v. Hodgson, Id. 488. Chief Justice Mansfield, in the last case, said: "Here the law could only raise an implied promise to discharge the ship in the usual and customary time for unloading such a cargo. That has been rightly held to be the time within which a vessel can be unloaded in her turn into the bonded warehouses." The same doctrine is fully sustained in Abbott on Shipping (pages 311–313); also, in The Mary E. Taber [Case No. 9,209]; Philadelphia & R. R. Co. v. Northam [Id. 11,090]; Towle v. Kettell, 5 Cush. 18. In the late case of Strong v. Quantity of Wheat [Case No. 13,541], in the United States district court, Northern district of New York, in manuscript, Judge Hall held that a master of a vessel was bound to know the custom of the port to which he conveyed a load of grain, and if the custom prevailed at the port that all grain should be unloaded at an elevator, and that the vessel should wait its turn, that the custom entered into and became part of the contract, and that the master was bound by that custom.

This distinction between the liability of consignees, when "lay" days and demurrage are provided for in bills of lading, and their liability where they are not mentioned and provided for, is fully recognized in all the reported cases. It is not recognized in rather a popular elementary work, because of the well known carelessness and want of research by its reputed author, and hence has grown up an extended misapprehension of the law on this subject. Bearing in mind this distinction, and the fact that this bill of lading was a general one, with no provision for "lay" days or demurrage, the question arises: Did Walton, by his neglect or fault, cause detention of this vessel? The detention from Wednesday to Friday, in waiting its turn to get to the elevator, was, according to the above authorities, and especially that from Judge Hall, of the Northern district of New York, a part of the contract, was in compliance with the custom of the port, and Walton, the consignee, was not liable. On Friday, after the elevator commenced to take in the cargo, finding the barley was wet, its managers refused taking it in until it was dried. The libellant claimed that the elevator stopped taking it in because of the orders of Walton, who wanted to consult the insurance company. The captain of the vessel so swears. Walton swears the contrary, and states positively that the elevator people refused to take it because of its condition. The burden of the proof of the fact is on the libellant, but the testimony is balanced, and I must assume that Walton did not order as claimed. If so, then the detention of the vessel from Friday to the next Tuesday was not Walton's fault, but was rather the fault of the master of the vessel, who permitted his cargo to become wet by the defective state of his hatches. Nor was it Walton's fault that the vessel was further delayed until next Thursday in consequence of the breaking of the machinery of the elevator, while it was engaged in taking in the barley. The master was aware of the well known and uniform custom in all the ports on the lakes: that grain is only unloaded from a vessel by and through an elevator, and that such was contemplated when he made his contract, and therefore he takes upon himself all the risks and accidents incident to such a method of unloading.

I am of the opinion, therefore, that Walton, the consignee, is not liable in this action. Libel dismissed.

NOTE. It seems to be assumed in this case that an action in personam will lie in admiralty against the consignee to recover demurrage occasioned by his default, and such appears now to be the law.

It has been lately decided by Judge Lowell, of the Massachusetts district, that a suit in rem will lie against the cargo to recover damages for delay in unloading. The Hyperion's Cargo [Case No. 6,987]. See, also, Tapscott v. Balfour, 1 Asp. Marit. Law Cas. 501; Ford v. Cotesworth, 3 Marit. Law Cas. 468.

GLOVE, The (GLENNY v.). See Case No. 5,484.

GLOVER (BAKER v.). See Case No. 769.

GLOVER (JOHNSON v.). See Case No. 7,385.

GLOVER (OWEN v.). See Cases Nos. 10,629 and 10,630.

GLOVER (RINGGOLD v.). See Case No. 11,845.

GLOVER (SMITH v.). See Case No. 13,051.

GLOVER (UNITED STATES v.). See Case No. 15,218.

GLOYD (McCLEOD v.). See Case No. 8 697.

GLYN, In re. See Case No. 6,322.

GLYN (POLAND v.). See Case No. 11,243.

GOBBOLD (LANE v.). See Case No. 8,051.