## Case No. 5,153.

### FULTON v. BLAKE et al.

[5 Biss. 371; [1] 2 Am. Law Reg. (N. S.) 779; 5 Chi. Leg. News, 527.]

District Court, N. D. Illinois. July, 1873.

W. H. Condon, for libellant.

Mr. Judd and W. F. Whitehouse, for respondents.

BLODGETT, District Judge. The essential facts, as I find them from the pleadings and proofs, are: That in the latter part of September, 1871, the firm of C. A. Blake & Co., Buffalo, N. Y., loaded on board said schooner Kate Hinchman, 426 tons Lehigh coal, consigned to Blake, Whitehouse & Co., of Chicago, at a freight of fifty cents per ton.

The schooner sailed with her cargo on the 29th of September, and arrived in the port of Chicago on the evening of the 16th of October, with her cargo on board, and on

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

the morning of the 17th the consignees were notified of her arrival and readiness to discharge cargo. The bill of lading contained no stipulation in regard to demurrage. The consignees were engaged in the coal business in this city, occupying two docks—one on the north branch of Chicago river, near Indiana street, capable of accommodating two vessels at a time, and the other near Eighteenth street, on the south branch, capable of unloading only one vessel at a time. Their dock at Indiana street was injured by the great fire of October 9th, and nearly all the employés at that dock were burned out, and no efficient help to unload at said dock was obtainable for many days after the fire.

When the Hinchman arrived, the Indiana-street dock was occupied by other vessels unloading coal, and she was directed to proceed to the Eighteenth-street dock, her towage bill being paid by respondents. This dock was occupied by the schooner King, which had arrived two days before the Hinchman, although she had sailed from Buffalo eight days after, and the Hinchman did not get alongside the dock so as to commence unloading until the afternoon of the 21st, and completed unloading on the 23d of October.

The respondents' business was such that they expected to receive and unload at their docks during the months of September and October of that year about four cargoes per week, and they had ample facilities for unloading that number. The respondents unloaded vessels consigned to them in the order in which they arrived and reported themselves ready to unload. The great fire considerably deranged respondents' business, and deprived them of the use of their largest dock for several days. The usual time, at that season of the year, for a voyage from Buffalo to Chicago was twelve days. It was admitted that by a general usage and custom in Chicago the consignee of a vessel is allowed one day after notice of her arrival in which to provide a dock or place for unloading her. And it appears from the proof that the respondents had machinery at their docks, by which they were able to unload coal from a vessel at the rate of ten tons per hour from each hatch, which was much more rapidly than it could be done at any other dock.

The amount involved in this suit is not of much consequence to either party, but the principle is important to all freighters, consignees and vessel owners.

It is objected that a suit will not lie for damages against the consignee unless there is an express stipulation for demurrage in the charter party or bill of lading, and, technically speaking, the respondents' counsel may be correct; but when the consignee of goods is notified by the carrier of his readiness to deliver the goods, it is the duty of the consignee to either refuse to receive the goods, which

under certain circumstances, not necessary now to mention, he may do, or to provide a place for the reception of the goods within a reasonable time, and what shall be deemed a reasonable time must always be a question of fact, to be determined by the circumstances of each case. By the usage of this port, one day is allowed the consignee of a vessel, after notice of her arrival, in which to provide a dock at which she can unload, and this usage, unless rendered unreasonable by controlling circumstances, should undoubtedly be considered as part of the contract.

It is also the duty of a person who is engaged in such business as to require him to expect or anticipate the arrival of vessels with cargoes consigned to him, to provide or arrange for sufficient dock-room to unload vessels as they arrive in port under ordinary circumstances within one day after arrival. That is to say, persons to whom vessels are consigned must provide such reasonable dock-room as their business ordinarily requires.

If a man's business is such that he would naturally receive two or three cargoes a week, he should provide dock-room for that number as they arrive in the order of sailing; but if, by reason of baffling winds or other delays, over which the consignee has no control, all of those vessels should arrive at once, instead of arriving in order of sailing, as he had reason to expect them, the consignee who has provided dock-room to accommodate three or four or a half-dozen vessels a week as they may successively arrive from day to day, is certainly not at fault if, from the poor sailing quality of some, or head-winds, or other causes over which he has no control, they all arrive on the same day, when he had a right to expect them on successive days in the order of sailing. And if, by reason of any such unexpected occurrence, several vessels arrive together, he is not obliged to procure other docks, but the vessels must respectively await their turns at the consignee's docks. This rule is more specially applicable to sailing vessels, which from their mode of propulsion are more uncertain in their times of arrival than vessels propelled by steam.

All persons engaged in dealing with ships, whether master, crew or consignee, are bound to give them dispatch, and whoever causes any unreasonable delay is answerable in damages.

A consignee to whom the cargo of a vessel is consigned should, within the time prescribed by the usage of the port after notice of the arrival of the vessel, furnish a suitable place for unloading, or he shall pay damages for detention, whether demurrage be noted on the bill of lading or not. It may not be what is technically called demurrage in the books, but it is damages for unreasonable detention, unless the vessel has arrived so far out of her expected time as to make such prompt dispatch unreasonable; in which case he must give her such dispatch as is reasonable under

the circumstances. And probably as safe a general rule as can be laid down is that if the consignee had provided ample docks for the accommodation of the vessels consigned to him in their order, vessels arriving out of the time when they ought reasonably to have been expected, must await their turn at the docks. Although this rule may have its exceptions, and should never be vexatiously or unnecessarily enforced to the delay and damage of a vessel, the interests of commerce—and that term as used by the courts means the interest of the public—require 'that ships should be kept moving. "Ships," says one author, "were made to plough the sea, and not to lie rotting at the wharves." Tested by these general principles, I am clearly of the opinion that the libellant has not made out a case entitling him to relief.

The respondents had provided ample dock-room for unloading the vessels consigned to them if they arrived in the order in which they might reasonably be expected. By reason of slow sailing qualities or bad management on the part of her master or crew, the Hinchman did not arrive till at least six days after she was reasonably due, and respondents were not bound to keep a dock waiting for her all that time, or have one ready just one day after her arrival. They are only bound to furnish her a dock in a reasonable time after her arrival, and under the evidence of this case, I do not think the delay from the 17th to the 21st unreasonable.

The city had, only seven days before the arrival of this vessel, been visited by one of the most destructive fires ever known, destroying nearly half of its docks, two-thirds of its stores and warehouses, and rendering one-third of its inhabitants homeless. I deem this alone such an intervention of unforeseen circumstances as excused the delay which occurred. Admitting that under ordinary circumstances the respondents would have been bound to furnish the vessel with a dock within one day after notice, there were extraordinary circumstances controlling all persons doing business in this city at that time, to such extent, at least, as absolve respondents from the consequences of the delay charged in this libel.

Libel dismissed at libellant's costs.