THE NETHER HOLME.

HINE et al. v. PERKINS et al.

(*District Court, S. D. New York.   April 26, 1892.*)

1. DEMURRAGE — CHARTER—BERTH—WHEN TO BE PROVIDED—ABSENCE OF STIPULATION.

In the absence of any charter stipulation as to the time within which a berth shall be provided for a ship after arrival, it must be provided within a reasonable time, or within such time as usage provides, which time, by the ordinary usage of the port of New York, is 24 hours after notice of arrival.

2. SAME—CHARTER—STIPULATIONS—DISCHARGE—"AS FAST AS SHIP CAN DELIVER"—DUTY OF CHARTERER—FOUR HATCHES.

Where the charter of a vessel having four hatches provides that the ship shall discharge "as fast as she can deliver," the charter saying nothing about the number of hatches to be used, and the wharves at which four hatches can be simultaneously worked in the port being the exception, and being no evidence that vessels of such size are accustomed to discharge from all four hatches at once, the charterer is not bound to provide a berth where all four can be used at once, but fulfills his duty by sending the ship to such a reasonably fit berth as is customary for her size and class, and by seeing to it, at such berth, that there are no hindrances on the dock, so that the vessel may discharge as fast as she can deliver, with the usual appliances therefor.

SAME—NONATTENDANCE OF CUSTOMHOUSE INSPECTOR.

After a ship is berthed, and permit to discharge obtained, the charterer is liable for delay caused by the nonattendance of a customhouse inspector.

In Admiralty.   Libel for demurrage.
*Convers & Kirlin*, for libelants.
*C. K. Souther*, for respondents.

BROWN, District Judge.   The charter of the Nether Holme provided that she "should discharge at one safe berth in New York harbor, as ordered by charterers; any subsequent removal to be at charterers' expense." Another stipulation was that she should "be discharged as fast as she can deliver in ordinary working hours."

The latter stipulation relates to the *rate* of discharge after she commences; it has nothing to do with the *time* within which a berth should be provided after arrival.   In the absence of any charter stipulation on that point, or as to when the laydays begin, the berth must be provided within a reasonable time, or such time as usage prescribes.   By the ordinary usage of this port, 24 hours after notice of arrival is allowed for procuring a berth.   Within the usual time a berth at Eighteenth street, to which the vessel was directed, was ready for her; but through the vessel's faulty conduct in coming prior to the time notified and then going away at once, instead of lying alongside and waiting a few hours, as she might have done, for the time appointed, she did not get into her berth until the evening of the 11th; and the discharge was begun on the following day.   It being high water from 8 to 9 o'clock A. M., she could have taken her berth as well at half past 10 or 11 A. M. on the 11th, as at 6 P. M.   No demurrage, or towage, is, therefore, allowed for the 11th.

Cunningham, the stevedore, was employed by the ship's agents. ' He testifies explicitly that he never worked more than two gangs, nor from more than two hatches. The ship was, therefore, not prepared at that dock, to deliver from more than two hatches. The provision of the charter that the consignees should take as "fast as the ship can deliver," did not bind them to take more than the ship was prepared to deliver, under such arrangements with the ship's stevedore for discharging as the ship herself had made; since the ship was bound to put the cargo over the ship's side. The respondents are answerable, however, for the half day's delay through the nonattendance of the customhouse officer during the forenoon of the 12th, after the ship had obtained a permit. *Carsaneyo* v. *Wheeler*, 16 Fed. Rep. 248. The master says that was the stevedore's fault, which would be the ship's fault. But I find that he is mistaken on that point. Through the incumbrance on the dock I find, also, that during the remaining half day of the 12th the consignees were not prepared to receive above half what the ship was prepared to deliver through the two hatches and by the two gangs of stevedores that she had provided. The libelants are, therefore, entitled to count three quarters of a day's delay for December 12th, at Eighteenth street.

The respondents are also chargeable for one half of December 13th at Forty-Second street, which was lost through delay in furnishing the transfer permit. The 14th was Sunday. The 17th was unfit to work through the rain. The ship finished discharging on Saturday the 20th at 1:30 P. M. The testimony shows that there was no hindrance or lack of diligence in the discharge at Forty-Second street after it was begun, from such hatches as were in fact used, namely, two hatches, prior to the 17th, and three hatches afterwards; and no complaint was made on that score. At this season "ordinary working hours" closed at sunset.

The libelants contend, however, that the stipulation of the charter that the ship should discharge "as fast as she can deliver in ordinary working hours," imposed on the consignee the obligation to receive from all four hatches at once; and to send the ship, moreover, to a berth where all four hatches should be worked at once. This construction, I think, is more rigid than the ship is entitled to. The charter is in one of the ship's own forms. It bears the stamp of her own agents. She is not entitled to read into it, therefore, by construction, more than its language imports. The charter says nothing about the number of hatches that are to be used, nor the kind of berth to which the charterer is to assign the ship. The wharves at which four hatches can be worked at once are the exception and not the rule. There is no evidence of any usage to discharge any vessels from all her hatches at once. The evidence, so far as it shows anything on the subject, and from the libelants' own witnesses, is that only two hatches were customarily used at once, though this related probably to smaller vessels. Reported cases show that this stipulation in charters has been in use for at least 20 years. *Dahl* v. *Nelson*, 6 App. Cas. 38, 42. In no case does it appear that such a construction of this clause has ever been given to it. In the recent case of *The Glenfinlas*, 42 Fed. Rep. 232, affirmed 1 U. S. App.

22, 48 Fed. Rep. 758, where the charter contained a similar provision, the ship was held entitled to discharge from two hatches, because the proofs showed that it was customary for vessels of her size, having four hatches, to discharge from at least two of them at once. It was also held in that case that under such a stipulation, the custom applicable to small vessels was not applicable to a much larger one; and that she was entitled to a berth reasonably adapted to her size, and to discharge from as many hatches as was customary with other vessels of her size and class, if procurable. Such, I have no doubt, is the reasonable construction of this clause, and what was intended by these parties. Had it been designed that she would be sent to a berth where four hatches should be used at once, and that all four must be used simultaneously, it should and would have been so stated in the charter, as was done in the case of *Grant* v. *Coverdale*, 9 App. Cas. 471. I think it certain that no shipping men reading this charter, would understand from it any such agreement or obligation.

Aside from the language of the charter, there is no evidence to show that vessels of this size or class are accustomed to discharge from four hatches at once. The libelants on this subject gave but a single word of testimony, to the effect that a wharf might have been procured where four hatches could be used. Where such a wharf was to be found was not stated, nor whether it was in the part of the port where the consignee under the discretion given him had a right to direct the ship for the economical transaction of his business. The evidence is insufficient, therefore, to show any breach or neglect of duty by the consignee in the selection of the wharf. The object of the charter in giving such a discretion to the consignee is that the cargo may be received at such place as may comport with necessary economy in the receipt, sale, or disposal of such cargoes. It is sufficient if the charterer sends the ship to a reasonably fit berth, considering her size and class, such as the wharf at Forty-Second street was. And the intention of the clause in question is, in my judgment, fully met, if at such a berth the charterer sees that there are no hindrances upon the dock in the receipt and carrying away of the cargo, so that the vessel may discharge as fast as she can deliver with the usual appliances therefor.

If the respondents are held chargeable with the duty of discharging at three hatches, from the fact that upon the ship's demand for more rapid discharge they rigged up means for discharging from an additional hatch on the afternoon of the 16th, still I find that upon computation the consignees did not occupy, on the whole, a longer time than a discharge from three hatches all the time would allow them. The charterers were not required to unload at night, but only "in ordinary working hours." But the charter provided that the vessel should "work at night when required by charterers, any extra expense thereby incurred to be paid by charterers." After the third hatch was prepared the respondents worked the ship for three nights, which presumably equals a saving of three days' time. Charging against the respondents the loss of three fourths of a day on the 12th, one half a day on the 13th, and the

loss of one day more for the use of only two hatches, instead of three, from the 13th up to the afternoon of the 16th, there would be but 2¼ days lost time chargeable against them, which is less than the amount saved by night work. As there is no proof that the ship was not allowed to discharge as fast as she could from the hatches used, the charterers did not exceed, therefore, the time at their disposal under the charter.

The extra expense caused by working the ship at night amounted to $139.70. Such extra expense, by the terms of the charter, was to be charged to the charterer. The latter, however, contends that it was chargeable to him only in case night work was "required by *him;*" and that such night work was not done upon the requirement of the charterer, but because the ship demanded it, and was assented to on condition that the ship should pay the extra expense. Language to that effect appears in a letter of the respondents in answer to the ship's claim for a quicker discharge, and in reply thereto. The discharge at night, however, was as much for the benefit of the charterer as for the ship. In the demurrage account the charterers are given the benefit of the night work, which has saved them about $434, which they would otherwise have been liable to pay the ship for demurrage. This night work was "required" by them in order to avoid the amount of demurrage. Under such circumstances it is the plain intent of the charter that the charterer should pay the extra expense of night work. It is like a substituted expense. *Wheelwright* v. *Walsh*, 44 Fed. Rep. 380. The libelants are, therefore, entitled to a decree for that amount, together with one towage to Eighteenth street, and one to Forty-Second street, amounting to $35; in all $174.70, with interest. The libelants not being successful on the principal item of the claim, namely, $1,358, for demurrage, no costs are allowed.