EMPIRE TRANSP. CO. et al. v. PHILADELPHIA & R. COAL & IRON CO.

(Circuit Court of Appeals, Eighth Circuit.    August 24, 1896.)

No. 747.

1. DEMURRAGE—STIPULATED LAY DAYS—CHARTERER'S OBLIGATION.
    Where the time for the discharge of a vessel is stipulated in the charter or
    bill of lading, or is definitely fixed by it, so that it can be calculated before-
    hand, the charterer thereby agrees to discharge her within that time, and he
    takes the risk of all unforeseen circumstances.

2. SAME—IMPLIED OBLIGATIONS.
    Where the charter or bill of lading is silent as to the time of unloading
    and discharge, there is an implied contract to discharge the vessel within a
    reasonable time.    70 Fed. 268, affirmed.

3. SAME—DILIGENCE IN DISCHARGE.
    This contract is, in effect, an agreement to discharge her with reasonable
    diligence.

4. SAME—REASONABLE DILIGENCE—CUSTOM.
    Under ordinary circumstances, the customary time for unloading a vessel
    at her port of delivery is a reasonable time for that work; but the implied
    contract is to discharge her in such time as is reasonable under all the ex-
    isting circumstances, ordinary and extraordinary, which legitimately bear
    upon that question at the time of her discharge, and it is not to discharge
    her in the customary time, regardless of unforeseen obstacles and unusual cir-
    cumstances.

5. SAME—BURDEN OF PROOF.
    The burden is on him who seeks to recover damages for the delay of a ves-
    sel, under such a contract, to prove that the charterer did not exercise rea-
    sonable diligence to discharge her under the actual circumstances of the par-
    ticular case.    70 Fed. 268, affirmed.

6. SAME.
    Proof that the vessel was delayed in unloading beyond the customary time
    for discharging such cargoes at the port of her delivery throws upon the
    charterer the burden of excusing the delay by proof of the actual circumstan-
    ces of the delivery and his diligence thereunder.

7. SAME—EXCUSES FOR DELAY—STRIKES.
    A strike of the employés of the charterer, without grievance or warning,
    and an organized and successful effort on their part to prevent, by threats,
    intimidation, and violence, other laborers, who were willing to do so, from
    discharging a vessel, held to excuse the charterer for a delay of a week in the
    performance of that work.

Appeal from the District Court of the United States for the Dis-
trict of Minnesota.

These are appeals from decrees dismissing libels against the appellee, the Phila-
delphia & Reading Coal & Iron Company, for damages for the detention of ves-
sels during the strike of 1894.    Each of the appellants filed a libel against the
appellee in the court below to recover damages for the detention of one of its steam-
ships for a period of 12 days during that strike.    The appellant the Empire
Transportation Company alleged, in its libel, that on June 30, 1894, the appel-
lee chartered its steamship, the W. H. Gilbert, to transport a cargo of coal owned
by the appellee from Buffalo, in the state of New York, to West Superior, in
the state of Wisconsin; that the ship arrived at West Superior, loaded, on July
4, 1894; that the appellee commenced to unload her on the next day, but ceased
on that day, before she was unloaded, and did not complete the unloading, or dis-
charge her, until July 17, 1894; that the usual and sufficient time to discharge
such a cargo, at the docks of West Superior, was 2 days; that she was detained
12 days longer than was necessary or reasonably required for her discharge;
and that the damage to the libelant was $200 per day.    The appellant the Mitch-
ell Steamship Company alleged, in its libel, that the appellee chartered its steam-
ship, the W. H. Gratwick No. 2, for the same purpose, on July 6, 1894, that

the vessel arrived at West Superior with its load on July 10, and that it was detained until July 24, 1894, before it was unloaded. In other respects it made the same allegations as were made by the Empire Transportation Company. The contracts of affreightment of the two vessels were identical in terms, and were attached to the libels. They were simple bills of lading, which contained no stipulation of any kind with reference to the time of unloading or discharging the vessels, but merely provided that the owners of the steamships should deliver the coal at West Superior, in good condition, upon the payment by the appellee of 25 cents per net ton, free of handling. The answers of the appellee to these libels were that, without any fault or negligence on its part, its employés struck, and refused to work, on July 6, 1894, without any previous warning of their intention so to do; that the appellee immediately hired other workmen to take their places, and used reasonable diligence to reorganize its working force, and to unload these vessels; but that the strikers organized into a body, and by violence and intimidation prevented some of the men it hired from working for it, scared away others after they commenced to work, and rendered the appellee powerless to discharge the steamships sooner than it did. The court below held that these allegations were true, that they constituted a good defense to the libels under the law, and entitled the appellee to decrees of dismissal. Such decrees were accordingly entered, and are now presented to this court for review.

Herbert R. Spencer, for appellants.

M. H. Boutelle, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

In the absence of any stipulation with reference to the time of unloading or discharge in a charter of a vessel, is the charterer liable to the owner of the ship for damages for her detention caused by a strike of his laborers and such subsequent intimidation and violence on their part as prevent other willing workmen from supplying their places? If so, is the finding of the court below, that the appellee used reasonable diligence to discharge these vessels, but was delayed without its fault by the intimidation and violence of the strikers, warranted by the evidence in these cases? These are the questions presented by these appeals.

Demurrage, strictly speaking, can be recovered only when it is expressly reserved by the charter or bill of lading. Gage v. Morse, 12 Allen, 410; The J. E. Owen, 54 Fed. 185, 186. But one who charters a vessel, under a contract that is silent as to the time of unloading and discharge, contracts by implication that he will unload and discharge her within a reasonable time or with reasonable diligence. Cross v. Beard, 26 N. Y. 85, 89; Fulton v. Blake, 9 Fed. Cas. 993, 995 (No. 5,153); The J. E. Owen, 54 Fed. 185; Burrill v. Crossman, 16 C. C. A. 381, 69 Fed. 747; The M. S. Bacon v. Erie & W. Transp. Co., 3 Fed. 344; Whitehouse v. Halstead, 90 Ill. 95, 98; Henley v. Ice Co., 14 Blatchf. 522, Fed. Cas. No. 6,364; Finney v. Railway Co., 14 Fed. 171; Houge v. Woodruff, 19 Fed. 136; Fish v. One Hundred and Fifty Tons of Brown Stone, 20 Fed. 201; Gronn v. Woodruff, 19 Fed. 143; The Z. L. Adams, 26 Fed. 655, 656; The Elida, 31 Fed. 420; The William Marshall, 29 Fed. 328; The Mary Riley v. Three Thousand Railroad Ties, 38 Fed. 254; Riley v. A Cargo of Iron Pipes, 40 Fed. 605; Bellatty v. Curtis, 41 Fed. 479, 480; Taylor

v. Railway Co., L. R. 1 C. P. 385; Burmester v. Hodgson, 2 Camp. 488; Ford v. Cotesworth, L. R. 4 Q. B. 127, L. R. 5 Q. B. 544; Hick v. Rodocanachi [1891] 2 Q. B. 626, 633, 638, 646; Hick v. Raymond (1891) 1 Reports, 125, 129, 133, 134; Postlethwaite v. Freeland, 5 App. Cas. 599, 621, 622. These libels seek damages for the breach of this implied contract. Where the time for the discharge of the vessel is stipulated, or is definitely fixed by the charter or bill of lading, so that it can be calculated beforehand, the charterer thereby agrees absolutely to discharge her within that time, and he takes the risk of all unforeseen circumstances. "He bears the risk of delay arising from the crowded state of the place at which the ship is to load or discharge (Randall v. Lynch, 2 Camp. 352); or from frost (Barret v. Dutton, 4 Camp. 333), or bad weather (Thiis v. Byers, 1 Q. B. Div. 244), preventing access to the vessel; or from acts of the government of the place prohibiting export, or preventing communication with the ship (Barker v. Hodgson, 3 Maule & S. 267; Bright v. Page, 3 Bos. & P. 295, note). And it is immaterial that the shipowner, also, is prevented from doing his part of the work within the agreed time, unless he is in fault. The charterer takes the risk." Carv. Carr. by Sea, §§ 610, 611; Davis v. Wallace, 7 Fed. Cas. 182 (No. 3,657); Railroad Co. v. Northam, 19 Fed. Cas. 492 (No. 11,090); Williams v. Theobald, 15 Fed. 465, 471; Manson v. Railroad Co., 31 Fed. 297; Sixteen Hundred Tons of Nitrate of Soda v. McLeod, 16 C. C. A. 115, 61 Fed. 849; Burrill v. Crossman, 16 C. C. A. 381, 69 Fed. 747, 752.

Over the principles of law which we have stated there is no dispute. The controversy is over the effect, upon the contracts in these cases, of the established fact that the customary time for the discharge of a cargo of coal at the port of West Superior was two days. It was conceded that, in the absence of proof of this customary time of discharge at that port, these contracts must fall under the first class of cases to which we have adverted, and that the only question would be whether or not the appellee discharged the vessels within a reasonable time, under all the circumstances of the case. The contention of counsel for the appellants is that the fact that such vessels were customarily discharged at that port in two days removes these cases from the first, and ranges them in the second, class of cases, to which we have referred. The position is, in effect, that proof of the customary time of discharge excludes from the consideration of the court every other fact and circumstance bearing upon the reasonableness of the time of the discharge of these vessels, and upon the reasonableness of the diligence of the appellee, and converts these contracts from agreements to unload the ships with reasonable diligence into absolute obligations of the appellee to discharge the vessels in two days, regardless of every unforeseen chance and circumstance. The argument is: One who contracts to unload a vessel within a fixed time takes the risk of all unforeseen circumstances. The custom of the port of delivery is by implication a part of every contract of affreightment. Therefore, one who makes a contract for the service of a vessel, which is silent as to the time of her discharge, enters into an absolute obligation to discharge her within the customary time at her port of delivery, and takes the risk of ev-

ery unforeseen obstacle and accident. Is it, however, true, that the custom of the port becomes by implication a part of such a contract, any more than every other fact and circumstance does which directly bears upon the reasonableness of the diligence of the charterer? The customary time for the discharge of vessels at any port is necessarily the time within which they are discharged under ordinary circumstances. Given the ordinary circumstances, and the customary time becomes the reasonable time, and, in that way, the key to the construction of the contract. Under such circumstances,—that is, under ordinary circumstances,—where the consignee, by the exercise of reasonable diligence, might discharge the vessel in the customary time, he has been properly held liable for detention beyond that time; and courts, in discussing such cases, have sometimes said that there was an implied agreement in the contract that the charterer would not delay the boat beyond the usual time of discharge in the port of delivery. On the other hand, where long delay has resulted from compliance with the custom of a port for vessels to take their turns at a dock, and the consignee could not, with reasonable diligence, have avoided this delay, the courts have often held that he was not liable therefor.

The cases relied upon by counsel for the appellants belong to one or the other of these classes. Higgins v. Steamship Co., 3 Blatchf. 282, 284, Fed. Cas. No. 6,469, illustrates the former class. The custom of the port was for boats to unload in turn. There were no extraordinary circumstances suspending the operation of the custom. The turn of libelant's boat came, and the consignee delayed it until another boat, over which it had the preference, had been brought to the dock and unloaded. The defendant was held liable for this delay. To the same effect are Whitehouse v. Halstead, 90 Ill. 95, 100; The Nether Holme, 50 Fed. 434; The Z. L. Adams, 26 Fed. 655. Burmester v. Hodgson, 2 Camp. 488, is an illustration of the other class of cases. In that case a ship was delayed 63 days, on account of the crowded condition of the docks, before it could get its turn. The custom of the port, however, was for vessels to take their turns in unloading. The court held that the extraordinary circumstance of the overcrowded condition of the docks excused the consignee from unloading within the time required under ordinary circumstances, and that he was not liable for the detention of the vessel until it could be unloaded in its turn. To the same effect are The Glover, 10 Fed. Cas. 501 (No. 5,488); Bellatty v. Curtis, 41 Fed. 479; The J. E. Owen, 54 Fed. 185; Bartlett v. A Cargo of Lumber, 41 Fed. 890; The Mary Riley v. Three Thousand Railroad Ties, 38 Fed. 254, 255; The M. S. Bacon v. Erie & W. Transp. Co., 3 Fed. 344; Gronn v. Woodruff, 19 Fed. 143; The Elida, 31 Fed. 420; Fish v. One Hundred and Fifty Tons of Brown Stone, 20 Fed. 201.

Every one of the cases last cited proves, upon careful examination, to be an authority against the appellant. It is clear that in each of them more than the customary or usual time was taken to discharge the vessel, but in each the court considered the extraordinary circumstance that the port was overcrowded with vessels, and the custom of taking turns, and held that, in view of all the facts and circumstances, the charterer or consignee was excused for the delay,

because the time used for unloading was reasonable, although it was longer than the customary time under ordinary circumstances. We have failed to find any decision among the cases cited by counsel for the appellants to the effect that the custom of a port excludes other facts and circumstances from consideration in determining the reasonableness of the time of the boat's discharge or of the diligence of the charterer. The decisions and opinions to which he referred amount to nothing more than this: that when a ship is to be unloaded, under ordinary circumstances, the customary method and the customary time in its port of delivery prove the reasonable method and the reasonable time, and measure the liability for detention, in the absence of countervailing evidence. But, suppose that the circumstances are extraordinary; suppose that the threats of reckless men and the violence of mobs suspend the operation of every custom of a port, and hold willing laborers and anxious dock owners alike in enforced idleness and utter helplessness for days; is the customary time for the discharge of a vessel under ordinary circumstances the reasonable time under such circumstances? Shall the reasonableness of the time within which a charterer is required to unload a vessel under such circumstances be measured by a consideration of ordinary circumstances only, or by a consideration of all the actual facts and circumstances at the time he was required to unload her? This is the real question in these cases.

It is not a new question. It has been carefully and exhaustively considered in the English courts. In Burmester v. Hodgson, supra, Chief Justice Mansfield said that, in a case where no time was fixed by the contract, the law could only raise an implied promise to discharge the ship in the usual and customary time for unloading such a cargo. But his decision in that very case was that the extraordinary circumstance that the docks were overcrowded excused the consignee for a delay of 40 days beyond the customary time under ordinary circumstances. In Ford v. Cotesworth, L. R. 4 Q. B. 127, L. R. 5 Q. B. 544, the charter party provided that the cargo was to be delivered in the usual and customary manner, but nothing was said about time. The cargo could not be landed until 7 days beyond the customary time on account of a threat of bombardment. Lord Chief Justice Cockburn directed the jury that, the charter party being silent as to the time for unloading, there arose an implied contract on the part of the freighter to unload and discharge within a reasonable time, and that the question whether the time occupied was reasonable or unreasonable was to be judged with reference to the means and facilities available, and the regulations and course of business at the port. The jury found that there was no unreasonable delay. The judgment on this finding was affirmed in both the court of queen's bench and the exchequer chamber, on the ground that the reasonableness of the time occupied in unloading must be determined, not with reference to the ordinary, but with reference to the actual, circumstances which attended the unloading. These decisions were rendered, too, it will be noticed, in a case in which the charter party expressly stipulated that the delivery should be in the usual and customary manner. The general proposition, that, where no time is fixed for unloading, it is the charterer's duty to

unload in the usual or customary time, was emphatically denied in this case by the court of queen's bench (L. R. 4 Q. B. 127), and by Lord Blackburn in Postlethwaite v. Freeland, 5 App. Cas. 621. In the latter case, the charter party provided that "the cargo is to be discharged with all dispatch according to the custom of the port." The ship was detained 35 days on account of the number of ships at the port of delivery awaiting discharge. Lord Blackburn said:

"In Taylor v. Railway Co., L. R. 1 C. P. 385, it was laid down that a 'reasonable time' meant what was reasonable under all the circumstances. Byles, J., there says: 'My Brother Hayes treats "ordinary time" and "reasonable time" as meaning the same thing; but I think "reasonable time" means a reasonable time, looking at all the circumstances of the case. The delay in this case was an accident, so far as the defendants were concerned, entirely beyond their control, and therefore I think they are not liable.' This is, I think, right, and applicable to the present case."

In Hick v. Rodocanachi, L. R. 2 Q. B. 626, 633, 638, 646, the owner of a ship sued for damages for detention caused by a strike of dock laborers. The charter party was silent as to the time of unloading. The time occupied in actually unloading the ship was 6 days, but, after the consignees had proceeded with the work 3 days, they were interrupted, and prevented by the strike from continuing it, for 30 days. The trial court held the consignees liable for the delay, on the ground that their implied contract was to discharge in a reasonable time under ordinary circumstances. In 1891 the consignees presented this case to the court of appeals, and argued that the reasonableness of the time for unloading must be considered with reference to the actual facts and circumstances at the time of the unloading, and not in view of the ordinary circumstances only, and the customary time of unloading. The court of appeals reversed the judgment below, and so held. Its decision was subsequently reviewed and affirmed by the house of lords in Hick v. Raymond, 1 Reports, 125, 129, 133, 134. Careful reviews of all the English authorities, and exhaustive discussions of this question upon principle, will be found in the opinions of the learned judges in this case at the pages of the report to which we have referred. We refrain from quotations. The decisions to which we have adverted put the question under consideration forever at rest in the English courts.

A careful examination of the decisions of many of the American courts has failed to convince us that they have ever taken a different view. In many of the opinions it is said that, where the charter is silent as to the time of unloading, the charterer or consignee is bound to discharge the vessel "in a reasonable time according to the custom of the port"; but when the decisions actually rendered in the cases in which these opinions were delivered are examined, it is plain that the learned judges who used this expression did not mean that the charterer was bound to discharge the vessel in the customary time, regardless of its reasonableness. All the American decisions show that, whether a custom of the port is proved or not, all the facts and circumstances, ordinary and extraordinary, which existed at the time of the unloading, have been uniformly considered in determining the reasonableness of the time of discharge. Thus, in the early case of Cross v. Beard, 26 N. Y. 85, decided in 1862, in which no customary time was proved, it was held that a storm on

one of the lakes and an accidental break in a canal, which caused a fleet of vessels to come to a port together that would otherwise have come singly, and thereby delayed the discharge of plaintiff's vessel, would warrant the jury in finding that the consignees were without fault, and that they discharged the boat in a reasonable time.    Judge Denio said:

"In such cases the defendant is not charged for the payment of a sum pursuant to the terms of a contract, but for general damages for the breach of his implied agreement.   This involves a greater or less degree of delinquency, and it would, therefore, be unreasonable to hold the defendant responsible, if he was able to show that it was in no respect his fault that there was a delay in loading or unloading the vessel."

In Fulton v. Blake, 5 Biss. 371, 9 Fed. Cas. 993 (No. 5,153), the proof was that the customary time for furnishing a vessel with a dock for unloading, at Chicago, was one day.    The libelant's vessel was delayed five days.    But Judge Blodgett held that the fact that one of the defendant's docks had been injured by the great Chicago fire, and that an unusual number of vessels had arrived for the consignees at the same time, without their fault, relieved them from liability for the delay.    He said:

"What should be deemed a reasonable time must always be a question of fact, to be determined by the circumstances of each case.  *  *  *  Admitting that, under ordinary circumstances, the respondents would have been bound to furnish the vessel with a dock within one day after notice, there were extraordinary circumstances, controlling all persons doing business in this city at that time, to such an extent, at least, as absolves respondents from the consequences of the delay charged in this libel."

These cases illustrate the current of the American decisions.   They apply the same rules of law to these contracts when a customary time of discharge is proved that they do when no custom is established, and the test of the liability of the charterer for the delay is the reasonableness of the time occupied in unloading, in view of all the existing facts and circumstances at that time.    Any other rule would contradict and destroy itself.    It is settled that the obligation of the charterer is to unload the ship in a reasonable time.   Our reason teaches that the time that is reasonable under ordinary circumstances—that is, the customary time—is always unreasonable under extraordinary circumstances.    If the extraordinary circumstances can never be considered to determine the reasonableness of the time, then the charterer must always unload all vessels that arrive under unusual circumstances in an unreasonable time.    If there was authority for such a proposition, we should hesitate long before adopting it.    We think there is none.

Our conclusions, founded, as we believe, upon reason, and supported, as we think, by the consensus of the opinions of the courts of England and America, are:

1. Where the charter of a ship is silent as to the time of unloading and discharge, there is no implied agreement that the charterer will unload or discharge her in the customary time at the port of delivery, regardless of all extraordinary circumstances and unforeseen obstacles.

2. The implied contract is to unload and discharge her in such time as is reasonable, in view of all the existing facts and circumstan-

ces, ordinary and extraordinary, legitimately bearing upon that question at the time of her arrival and discharge.

3. This implied contract to discharge the vessel in a reasonable time is, in effect, a contract to discharge her with reasonable diligence.

4. The burden is on him who seeks to recover damages for the delay of a vessel, under such a contract, to prove that the charterer did not exercise reasonable diligence to discharge her, under the actual circumstances of the particular case.

5. Proof that the vessel was delayed in unloading beyond the customary time for unloading such cargoes at the port of her delivery throws upon the charterer the burden of excusing the delay by proof of the actual circumstances of the delivery and his reasonable diligence thereunder.

In support of these propositions, we refer to the authorities cited at the opening of this opinion, and to the following analogous cases, which have arisen upon claims against common carriers for damages for delays in transportation, caused by strikes and accidents, without their fault: Geismer v. Railroad Co., 102 N. Y. 563, 571, 7 N. E. 828; Railroad Co. v. Hazen, 84 Ill. 36, 38; Railway Co. v. Hollowell, 65 Ind. 188, 195; Railway Co. v. Levi, 76 Tex. 337, 343, 13 S. W. 191.

Under these rules of law, the allegations of the answers in these cases plead good defenses to the libels, and the only remaining question is, did the appellee exercise reasonable diligence to discharge these vessels under the actual circumstances of these cases? The W. H. Gilbert arrived at West Superior on July 4, 1894. On the next day, the appellee commenced, and during that day continued, to unload her. On July 6, 1894, its employés struck. They refused to work on that day or any other day. They had no grievance, had made no demands of their employer, and had given no notice of their intention to quit its service. An organization of workmen upon railways called the "American Railway Union" was then engaged in conducting a strike on their behalf. The laborers on the coal docks at the ports of Duluth and West Superior were organized into a body called the "Coal Handlers' Protective Union." These two unions appear to have made common cause. Within a day or two of July 6, 1894, all the workmen engaged on the coal docks in Duluth and West Superior refused to work. After they had quit their occupations, they served a demand upon the appellee and the other dock owners in those ports that the scale of wages for boatmen should be raised 25 per cent., that no discriminations should be made against any man for taking part in the strike, and that the new scale of wages which they demanded should be binding from July 5, 1894. This strike occurred in the midst of a great financial depression, when many laboring men were without employment and were begging for work. The appellee immediately commenced to hire other men to take the places abandoned by the strikers. It hired 4 on the very day of the strike. It continued to hire men at Duluth, at West Superior, at St. Paul, at Minneapolis, and at Milwaukee, until it finally resumed work on July 14, 1894. Before the evening of July 7th it had hired 7 men. On July 10th or 12th, it received laborers from Milwaukee.

On July 13th or 14th, it received them from St. Paul and Minneapolis.   On July 17th, it finished unloading the W. H. Gilbert.   Meanwhile, the strikers and their associates were organized to prevent any laborers from working on these docks.   In order to get to the dock of the appellee by land, workmen necessarily traveled from half a mile to a mile through lands covered with brush and stumps back of the dock,   The strikers stationed a picket line on this land, and caught and ordered back any men going toward the dock.   They were armed with clubs.   The appellee had 4 or 5 men at the dock at work on the first day of the strike, but when they started to come to work the next morning, they were stopped by these men on picket duty, and turned back.   One man who came to the dock the first morning, stepped over the line, and was assaulted so that he was unable to work.   Finding that the lives of the men it was hiring were in danger, the appellee called for police protection, and from 10 to 30 policemen were stationed on the docks from July 7 until the strike was defeated.   Meanwhile the appellee brought its laborers to the dock by boat, anchored a scow in the water beyond the dock, and boarded the men upon it under the protection of the police.   The strikers threatened the workmen on the docks, and scared many of them away.   The mayor of West Superior testified that he should think that the number of strikers and immediate sympathizers aiding and abetting them was 1,000; that men who were supposed to be strikers laid in wait for men who were going home from the docks, and would hit them with clubs and stones.   He said that it would have been utterly impossible for the owners of the docks to resume business without protection; that the regular force of 38 policemen was necessarily increased by 125 specials; that there would have been no question about obtaining sufficient laborers to conduct the ordinary operations of the coal docks, if they had not been frightened; that he never saw a man he was afraid of, but that he would no more have gone to work upon those docks without police protection than he would have gone into battle; that he should think, if he went down there to work, he was taking his life in his hands.   The appellee finally resumed operations on July 14, 1894, under a guard of policemen, in the presence of 200 or 300 men, who had gathered as near to the dock as they could get, and were hooting and calling the workmen names.   It is true that most of the testimony which establishes this condition of things was contradicted, but, after a careful consideration of all the evidence in the case, the record fails to convince us that the character of this strike, or the character of the operations of those engaged in it, was either harmless, peaceful, or benevolent towards the nonunion men, who took the places the strikers had abandoned, or towards the appellee, which employed them.   We think the testimony of the mayor of the city, the mob on the dock when work was resumed, the boarding house anchored in the bay beyond the reach of the strikers, and the 30 policemen who stood guard over the new employés of this appellee, indicate the character of the strike, and the intentions of those engaged in it.   In the face of these obstacles, the appellee resumed operations in 8 days, and finished unloading the Gilbert in 11 days,

after its workmen quit. The evidence amply sustains the finding of the court below that the appellee exercised reasonable diligence in discharging this boat in the face of these unforeseen and extraordinary circumstances.

The suggestion that the Reading Company might have resumed operations earlier by hiring the men who had discharged themselves at the rate of 50 cents, instead of 40 cents, an hour, and by agreeing not to prefer other workmen as employés, is not entitled to extended consideration. The market rate of wages for men of this class was 40 cents an hour. That was the rate at which the strikers worked without complaint until they abandoned their employment. That was the rate at which the new employés were paid. The exercise of reasonable diligence does not require an employer to hire, at wages 25 per cent. above the market rate, a set of men who have abandoned its employment, without warning, at a critical time in the conduct of its operations, and banded themselves together to prevent, by intimidation and violence, other workmen from carrying on its legitimate business, nor does it require such an employer to agree not to prefer, or not to prefer in fact, faithful and willing laborers, at going wages, as its employés, to those who have acted in this way, at wages 25 per cent. higher. There is nothing in Brown v. Certain Tons of Coal, 34 Fed. 913, in conflict with these views.

There is no essential difference between the facts in the two cases in hand, and our conclusion is the same in both. The position that the appellee was negligent in the case of the W. H. Gratwick No. 2, because it was chartered on July 6th, after its employés had left, cannot be maintained, because the fact was that there were plenty of other workmen ready to take their places, and who would have taken their places before July 10th, when that steamship arrived at West Superior, if they had not been prevented by intimidation and violence. The appellee was not required to presume that its right to employ other workmen, and their right to work on such terms as they could agree upon, would be taken from them by the acts of others. It had the right to presume that the laws would be obeyed, and its own rights and those of the willing laborers it should hire would be respected. It is not negligence to contract upon that presumption. The conclusions of the court below must be affirmed in both cases.

We are unwilling to close this opinion without an expression of our appreciation of the briefs presented and the arguments made by the counsel for the respective parties in these cases. Their clear and concise statements of their views of the law, and their reasons for them, their exhaustive examinations, citations, and classifications of the authorities according to their respective views, and their careful and accurate abstracts of the evidence, verified by references to the pages of the record, have left us without doubt of the soundness of our conclusions, and have made the preparation of the opinion of the court an easy task. The decrees below must be affirmed, with costs, and it is so ordered.