TWEEDIE TRADING CO. v. NEW YORK CENT. & H. R. R. CO.

(District Court, S. D. New York. January 2, 1912.)

1. SHIPPING (§ 184*)—CONTRACT OF AFFREIGHTMENT—TIME FOR DISCHARGING.
    Evidence *held* to sustain the finding of a commissioner that the working day for discharging certain vessels at Colon was eight hours, and not ten hours.
    [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 184.*]

2. SHIPPING (§ 177*)—CONTRACT—DISCHARGE OF CARGO.
    A provision of a shipping contract, requiring the shipper to receive cargo as fast as it could be discharged by the ship, is to be reasonably construed, and, where the parties knew that cargo was to be transported by rail from the dock, the shipper had the right to discharge into cars, although it involved a somewhat longer time.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–584; Dec. Dig. § 177.*]

3. SHIPPING (§ 177*)—DEMURRAGE—DELAY IN RECEIVING CARGO.
    Under a contract of affreightment for the carriage of bricks from New York to Colon, which required the shipper to receive cargo "as fast as steamer can unload, working all hatches," where cargo of other shippers was stowed above the bricks, and had to be first unloaded, time did not begin to count against the shipper until the last hatch was ready to discharge the bricks, and, if such hatch was not kept waiting, the shipper was not chargeable with demurrage.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–584; Dec. Dig. § 177.*
    Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by the Tweedie Trading Company against the New York Central & Hudson River Railroad Company. On exceptions to report of commissioner. Sustained in part.

See, also, 166 Fed. 993.

Ralph James M. Bullowa, for libelant.

Charles C. Paulding, for respondent.

HAND, District Judge. · [1] The libelant's exceptions to the report are of four kinds, which I shall take up seriatim. The first is that it finds the working day was eight hours, not ten hours. The whole discharge was done without exception by eight hours' work day, and absolutely the only evidence to show that the customary day is ten hours is Biord's and Smith's. Biord's testimony is reconcilable with the conceded facts only by supposing that the "ten-hour day" to which he referred included the two-hour dinner period, which all concede to have existed. Else it is very strange that he should have spoken without comment of a custom which he did not observe in a single instance throughout the discharge of all three of these ships. Moreover, if he did not mean to include the dinner period, the occasional 12-hour day which he speaks of must have begun at 5 a. m. and lasted till 7 p. m., or began at 6 a. m. and lasted till 8 p. m. While, of course, such hours are possible, they are highly unlikely especially in tropical climates. In view of the uniform practice in these cases, I agree with the commissioner in this interpretation of Biord's testimony. As to Smith's testimony, it does not appear that he knew anything of the work day at Colon except as he learned it in this instance, which was not "ten hours' work in a day," but eight hours' work without a single exception. Certainly the commissioner was quite right in holding that there was no proof that the eight-hour day as practiced was not the customary day there. It is quite clear that, although the West Indian negroes were not within the eight-hour law (Act Feb. 27, 1906, c. 510, 34 St. at L. p. 33. [U. S. Comp. St. Supp. 1909, p. 1372]), it would be impossible to work them for more hours than their gang foreman, if he was a "laborer or mechanic" under the act, and that, in any event, it would be likely to lead to all sorts of complications to have working days of different lengths among laborers who might be doing work side by side. Thus the train crews which shifted the drills were presumably not West Indian negroes, and were within the act. When they struck off work, the discharge necessarily stopped.

The second point is the delay in supplying the Sangstad with a berth between February 1st and February 4th. The charter party provided "at Colon berth to be supplied each steamer * * * immediately on steamer's arrival." I cannot see how in view of this absolute undertaking the respondent can avoid liability for these three days. The commissioner does not charge the ship with this, because she was not ready to discharge bricks till the general cargo was out, but I think that he fails to observe that a delay of three days in failing to berth delayed the time when the general cargo could begin discharging and therefore when it was finally discharged. Thus it delayed

the discharge of the bricks along with the general cargo. Surely it makes no difference at which end the delay occurs, if the respondent be responsible for it. I must therefore charge the Sangstad with these three days.

[2] The third point is that the discharge was into cars, and not upon the dock. I agree that the respondent must be held to a strict liability to receive as fast as the buckets or "tubs" could be loaded and dumped over the side, but the question here is how the "tubs" were to be dumped, whether helter-skelter in a pile, or accurately over a car. It takes longer to steady them over a car, and the difference of time has been calculated. The question is how the respondent was to "receive" the cargo. Considering that the parties knew the purpose for which the bricks were to be used, the idle waste involved in rehandling, the destination of the bricks to a place reached from Colon only by rail, and considering the practical construction of the contract by the libelant's agents, who did not suggest at the time any other way of "receiving," I agree with the commissioner in regard to this point. The phrase "ship's tackle" in the bill of lading has nothing to do with the matter, so far as I can see. The ship accepted such a mode of discharge as was reasonable and customary under the circumstances. It would be absurd and oppressive to say that the ship might dump them on the dock to be there once again picked up and put into cars for carriage. It would be as reasonable to say that they might roll them out of a short chute and let half of them break from a 20-foot drop, because that was a quicker way.

[3] The fourth point is that the commissioner did not hold the respondent for demurrage until after all the general cargo had been delivered. The true rule is, as applied by the commissioner in the case of the Dundonian, that the time for discharging bricks from each hatch began when the superimposed general cargo was taken out, and that thereafter the proper rate of discharge was 22½ tons per hour per hatch. The hatch last emptied under these conditions put a period to the lay days, and thereafter demurrage ran against the respondent. It is, of course, absurd to add together the total number of hours which all the hatches were kept waiting, and charge the respondent with that. It would be of no consequence how long those hatches which began first were kept waiting, provided that they finished before the hatch which began last, and that that last hatch was not kept waiting. The meaning of "working all hatches" is that no hatch shall be kept waiting for any others. The allowance of five days' demurrage in accordance with these figures I confirm.

The question of law raised in this branch of the case is whether, if the cargo of a ship be in layers, the owner of the lower layer is responsible under the charter party for demurrage, although he discharges with all reasonable dispatch, if the owner of the upper layer be delinquent in his own discharge. When the charter party engages the charterer or cargo owner to discharge by a fixed day, or in a fixed number of days, the law is now settled in England that the owner of the lower layer is responsible regardless of his own default (Leer v.

Yates, 3 Taunt. 387, Porteus v. Watney, L. R. 3 Q. B. Div. 534), in spite of two rulings of Lord Tenterden to the contrary in Rogers v. Hunter, Moody & Malkin, 63, and Dobson v. Droop, Moody & Malkin, 441. Regardless of which rule is preferable, if the matter were to be decided in this case, I think the rule clearly distinguishable as being only an instance of the stringent principle of Thiis v. Byers, L. R. 1 Q. B. Div. 244, that, when a charterer engages to deliver by a day certain, he assumes all risks of what may come up to prevent. The rule is the same in this country (Empire Transportation Company v. Philadelphia & Reading Company, 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623), but it is not applicable in the case at bar because the charterer did not engage to discharge the ship by a certain day, or indeed to discharge her at all, but only to receive the cargo as fast as the steamer could unload, working all hatches at once. The commissioner was clearly right under such a charter party in holding that each cargo owner was answerable only for his own default. Thus, if the cargo of A. has to be removed before that of B., B.'s only duty is to receive as fast as the steamer can unload from the time she begins to unload his cargo, and, to recover against B., the ship must show, first, that B. did not receive, and, second, that there was a period of delay caused by B.'s failure. I do not mean that, if A.'s cargo was in one hold and B.'s in another so that each could receive independently, it would excuse B. to show that, if he had not been in default, A. would have detained the ship anyway. That is another case, and I leave that to be passed on when it occurs, but I do mean that, whenever the discharge of A.'s cargo is a condition upon B.'s, then B. is liable only for demurrage after A.'s has been removed.

In the case of the Melderskin, the difficulty of making any allowance is that there is no way of fixing the time when the last hatch could begin to discharge bricks, and that, as I have shown, fixes the time when the lay days begin, assuming that all hatches have the same number of bricks. The estimates of the commissioner in his first report are about as near as the matter can be fixed, and I see no reason to change his finding in that respect. If there had been the discharge reports which were produced in the case of the Sangstad and the Dundonian, this might have been remedied, but they were apparently not available. The difficulty is indeed in determining what part of the delay occurred when drills were needed for brick and what part when they were needed for the general cargo. I know of no way in which any quantitative estimate can be reached as to this a priori, and nothing is therefore left but to take the admissions of Biord as to what he remembers the average delay to have been. The other ways are all falacious. One should not divide the delay proportionately according to the tonnage of the brick and the general cargo, because that would assume that the cargo was all dischargeable at the same rate per ton, which was certainly not true. One cannot assume that the bricks had no time to wait, because there was general cargo in the holds and no one can tell how long it took to get it out. If the respondent were

responsible for all the delays, the problem would be easy, but under the facts as they are the commissioner has done as well as can be done.

The case of the Sangstad is similarly baffling, because the delivery from all hatches of general cargo and bricks went on up to the 23d of February, and it is therefore impossible to say whether the delay in getting out the bricks was, as Biord insists, because the general cargo which lay mixed with the bricks was delayed, or because there was delay in supplying the cars for the bricks themselves. The ship's master's stipulated testimony is certainly wrong when he says that after February 10th all the general cargo was out of the hatches. It is the only testimony to contradict Biord's, and the discharge reports tend to corroborate Biord in supposing that the cargo in the holds was mixed up. Of course, it was possible that each hold contained the general cargo in a different part from what the bricks occupied, yet it is somewhat hard to suppose that the cargo should have been so stowed. On the whole, the commissioner was certainly right in holding that it was ambiguous whether the general cargo which was being discharged until February 23d did or did not interfere with the removal of the bricks; that is, whether they were in layers, or generally mixed, or how they were stowed. It is therefore quite impossible to fix a time before February 23d, and say that from it the bricks should be delivered at the rate of nine hundred tons per diem, and to charge the respondent with the delays. Thus the case is like the Melderskin rather than the Dundonian.

I cannot, however, agree with the commissioner in allowing but one day's demurrage. Assuming with him, as I do, that there is nothing in the additional proofs which would enable any one to get to a nearer quantitative valuation of the delay, and that the ship's master was in error, there is still nothing to cause him to abandon Biord's general estimate which he accepted on the first report. On the other hand, there is strong corroboration of the libelant's claim that the ship was greatly delayed in the discharge of the bricks by the failure to furnish cars. The letters of the master to the libelant are in evidence, and show very persuasively that the respondent continually failed to have enough cars on hand. Although this delay applied indifferently to both bricks and general cargo, it must nevertheless be charged in some part against the respondent, because it by no means follows that the respondent is not responsible till the last of the general cargo is out of the ship, provided there was opportunity before then to discharge some of the brick. Thus, if there was a delay of two hours in taking out one layer of bricks and afterwards there came the last layer of pipe and then the last layer of bricks, the respondent would be responsible for the two hours' delay, though it occurred before the last layer of pipe was touched. Moreover, the respondent may have removed the last layer of bricks in standard time which would make it improper to charge him with anything for that. Thus, it seems to me that the commissioner was in error in his calculations regarding the Sangstad. I will allow for demurrage in discharge three days as in the case of the Melderskin.

The decree will be as follows:

For the Melderskin:
Three days' demurrage at Colon......................      $ 924 16

For the Dundonian:
One day's demurrage at New York............... $ 256 74
Five days' demurrage at Colon.................... 1,243 70
Paid stevedores at New York..................... 214 50

     1,714 94

For the Sangstad:
One day's demurrage at New York............... $ 233 51
Three days' demurrage at Colon, for failure to
berth ..................................... 700 53
Three days' demurrage for delay at Colon in sup-
plying cars......... ........................ 700 53
Paid stevedores at New York .................... 150 48

     1,785 05

     $4,424 17

The interest will run as stated in the report. Let a decree pass for such a sum with costs.